

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

July 19, 2024

By ECF

Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

  Re: *Zherka v. Garland*, No. 22-1108
    Oral argument held May 8, 2023, before Judges Newman, Lynch, and Pérez

Dear Ms. Wolfe:

  The government respectfully submits this supplemental letter brief in response to the Court's June 26, 2024, order directing the parties to address the effect of the Supreme Court's decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), on this case. In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits firearm possession by an individual who is subject to a domestic-violence restraining order, does not violate the Second Amendment on its face or as applied to the defendant in that case. *Rahimi*'s reasoning supports the government's position that 18 U.S.C. § 922(g)(1), which prohibits a person convicted of "a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm, comports with the Second Amendment. Section 922(g)(1) is consistent with the principles, rooted in our nation's historical tradition, that legislatures may disarm individuals who have been convicted of serious crimes, or whose firearm possession poses a risk of danger to themselves or others. *Rahimi* also

undermines Zherka's contrary arguments, which repeat the same methodological errors that *Rahimi* addressed. The district court's judgment should accordingly be affirmed.[1]

## I. The Supreme Court's Decision in *Rahimi* Clarified the Analytical Framework Governing Second Amendment Challenges

In *Rahimi*, the Supreme Court upheld § 922(g)(8) under the Second Amendment. The Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 144 S. Ct. at 1896. Those provisions include surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond" to ensure the individual's "good behavior"; and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 1899–901. The Court concluded that, "[t]aken together, the surety and going armed laws confirm" that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. The Court acknowledged that "Section 922(g)(8) is by no means identical to these founding era regimes," but it explained that "it does not need to be": section 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.*

---

[1] Following *Rahimi*, the Supreme Court granted certiorari, vacated, and remanded several challenges to § 922(g)(1) pending in other courts of appeals. *See* Order List (July 2, 2024), https://www.supremecourt.gov/orders/courtorders/070224zor_2co3.pdf (granting certiorari and vacating and remanding the decisions in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023); *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023); *United States v. Cunningham*, 70 F.4th 502 (8th Cir. 2023); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023); *United States v. Doss*, No. 22-3662, 2023 WL 8299064 (8th Cir. Dec. 1, 2023)).

In addition, the Ninth Circuit has vacated its decision in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024)—the subject of an exchange of Rule 28(j) letters in this case—pending rehearing en banc. 2024 WL 3443151 (9th Cir. July 17, 2024).

In reaching its decision, the Court clarified that its Second Amendment precedents do not demand "a law trapped in amber"; the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. As Justice Barrett emphasized in concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring).

Accordingly, the Court explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898 (emphasis added). Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," so long as the law "comport[s] with the principles underlying the Second Amendment." *Id.* (quotation marks omitted). *Rahimi* also makes clear that these historical precursors are to be viewed as a whole to cast light on the relevant principles, rather than each dissected in turn for minute differences. *Id.* at 1902–03 (rejecting the dissent's argument that § 922(g)(8) was not sufficiently similar to historical analogues); *see United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024) (rejecting a "divide-and-conquer approach to the historical evidence"); *contra id.* at 1944 (Thomas, J., dissenting) ("The question before us

is whether a single historical law has both a comparable burden and justification as § 922(g)(8), not whether several laws can be cobbled together to qualify.").

## II.    *Rahimi* **Supports the Government's Position That § 922(g)(1) Is Consistent with History and Tradition**

As the government explained in its brief, this Court's binding precedent forecloses Zherka's Second Amendment challenge to § 922(g)(1) (Gov't Br. 16-17), and, as a matter of constitutional text, individuals with felony convictions are not among "the people" who possessed a "right to keep and bear arms," as those terms are historically understood (Gov't Br. 10-16). The Court's reasoning in *Rahimi* is fully consistent with these arguments, which the government maintains are independent bases for rejecting Zherka's Second Amendment challenge.

In any event, *Rahimi* supports the government's position that § 922(g)(1) fits comfortably within the historical tradition of firearm regulation because it is "consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898. Three types of historical evidence, taken independently and together, support § 922(g)(1)'s constitutionality, including in its application to Zherka.

First, historical tradition permits Congress to disarm individuals convicted of serious crimes, including non-violent ones. (Gov't Br. 22-24). This source of legislative authority flows from common law and founding-era capital punishment and estate forfeiture laws, laws disarming individuals convicted of non-capital crimes, and a "highly influential" Second Amendment precursor indicating a founding-era recognition of legislatures' authority to disarm persons "for crimes committed . . . violent or not." (Gov't Br. 21-22 (emphasis and quotation marks omitted)). Indeed, the standard penalty at common law and in the early American republic for a felony was death, a penalty extended to non-violent offenses such as smuggling, 4 William

Blackstone, *Commentaries on the Laws of England* 155 (1769); fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; or forging a marriage license, *id.* at 163. A felon awaiting execution would be held in prison, with no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his chattels, including arms. *See id.* at 379-82. A convicted felon, finally, was deemed "already dead in law" even before his execution, *id.* at 374, resulting in "an extinction of civil rights" including the right to bear arms, *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888); *see id.* at 156 (Earl, J., dissenting). Even non-felonious offenders could be disarmed for non-violent offenses such as failure to attend church services or defamation. 4 Blackstone 55; *see* Petition for Writ of Certiorari 13-16, *Garland v. Range*, No. 23-374 (filed Oct. 5, 2023) ("*Range* Pet."). Historical tradition thus demonstrates Congress's authority to disarm felons, as it did in § 922(g)(1).

Second, felon-disarmament laws like § 922(g)(1) are themselves sufficiently "longstanding" to form part of the nation's tradition of gun regulation. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The United States has a century-old tradition of disarming violent criminals (regardless of whether their crimes constitute felonies). *See* Defendants' Motion to Dismiss Amended Complaint at 18-19, *Atkinson v. Garland*, No. 21 Civ.291 (N.D. Ill. July 15, 2024), ECF No. 40-1 (collecting sources). And the United States also has a century-old tradition of disarming convicted felons (regardless of whether their crimes are violent). *See id.* at 19-20. Today, at the federal level, § 922(g)(1) is by far the most commonly applied firearm disqualification in § 922(g). In addition, every single state and territory has enacted some form of felon-disarmament law—*i.e.*, a law that disqualifies

individuals from possessing, carrying, or buying firearms because of felony convictions. *Id.* at 20.

The century-old, nationwide tradition of disarming convicted felons (including non-violent felons) strongly supports the permissibility of § 922(g)(1). Although post-ratification evidence cannot overcome clear constitutional text, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see id.* at 1924 (Barrett, J., concurring) (recognizing that post-ratification history can be "an important tool"). And the Supreme Court has often relied on post-ratification history, including history from long after the founding, in resolving constitutional ambiguities. *See, e.g.*, *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 75 (2022) ("[F]or the last 50-plus years, federal, state, and local jurisdictions have repeatedly relied upon on-/off-premises distinctions."); *Noel Canning v. NLRB*, 573 U.S. 513, 533 (2014) ("[T]hree-quarters of a century of settled practice is long enough."); *American Legion v. American Humanist Association*, 588 U.S. 29, 66 (2019) ("[T]he Cross . . . has stood undisturbed for nearly a century.").

Third, the United States has a longstanding tradition of legislatures disarming categories of persons who pose a danger of misusing firearms, and § 922(g)(1) rests on such a categorical judgment by Congress. For example, legislatures have enacted laws categorically disarming loyalists, underage individuals, and vagrants—each time without requiring case-by-case findings of dangerousness or irresponsibility. *See Range* Pet. 17. State courts have upheld those laws, even though the laws did not require an individualized assessment of danger. *See, e.g.*, *Missouri v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding a

ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms"); *Ohio v. Hogan*, 58 N.E. 572, 575 (Ohio 1900) (upholding a law categorically disarming "tramps").

Moreover, *Rahimi* confirms that, in assessing these historical traditions, courts are not confined to examining rules that applied only to firearms. *Rahimi* itself relied on the historical surety tradition to sustain § 922(g)(8), even though that tradition was not limited to "target[ing] the misuse of firearms." 144 S. Ct. at 1898–900. *Rahimi*'s approach thus aligns with the Supreme Court's practice of consulting a "variety of legal and other sources" in assessing the Second Amendment's original meaning, *Heller*, 554 U.S. at 605, including English history, *id.* at 598-600; analogous provisions in state constitutions, *id.* at 600-03; Second Amendment precursors, *id.* at 604-05; commentary, *id.* at 605-10, 616-19; case law, *id.* at 610-14; and legislative debates, *id.* at 614-16; *see Bruen*, 597 U.S. at 20-21; *Perez-Garcia*, 96 F.4th at 1191 ("although traditional firearm regulations are an important form of historical evidence, they are not the only one").

*Rahimi* also expressly recognized that a historical precursor's use of different consequences to address a societal concern does not necessarily render it an inapt analogue. For example, *Rahimi* did not discount going-armed laws because they authorized imprisonment, rather than disarmament, as punishment. 144 S. Ct. at 1902. To the contrary, the Court acknowledged that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* Similarly, if death and estate forfeiture were permissible consequences for individuals convicted of serious crimes—even non-violent ones— then the lesser restriction of disarmament is also permissible. *See Medina v. Whitaker*, 913 F.3d

152, 158 (D.C. Cir. 2019) (explaining that "it is difficult to conclude that the public, in 1791, would have understood someone facing death . . . to be within the scope of those entitled to possess arms"); (Gov't Br. 22-23).

"Taken together," these regulatory regimes are "relevantly similar" to § 922(g)(1). *Rahimi*, 144 S. Ct. at 1901. Section 922(g)(1)'s prohibition on firearm possession is comparable to, and is certainly not greater than, the burden imposed on those disarmed based on convictions for serious (even non-violent) criminal conduct at the founding, who were often disarmed, deprived of all of their property and civil rights, or condemned to death. (Gov't Br. 22-24). And these laws have a comparable justification: to prohibit firearm possession by individuals with convictions for serious criminal conduct or who Congress reasonably believes are likely to present a special danger of firearm misuse or disrespect for the law. (Gov't Br. 17-21).

## III.    *Rahimi* Undermines Zherka's Contrary Arguments

In reaching a contrary conclusion, Zherka endorses the very methodological errors that *Rahimi* rejected.

Zherka suggests that the government must establish that "a total deprivation of gun rights was the historical norm in connection with (what we now call) 'felonies.' " (Reply Br. 4). But *Rahimi* clarifies that in evaluating a Second Amendment challenge, courts assess whether the challenged law "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898; *see id.* at 1901. Zherka's proposed methodology instead echoes those of courts that "have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases" and have erroneously suggested that the Second Amendment permits only "those regulations identical to ones that could be found in 1791," *id.* at 1897–98—an approach similar the one advanced in the *Rahimi* dissent, *see id.* at 1931–32 (Thomas, J., dissenting).

In any event, although the existence of founding-era statutes that similarly disarmed all felons would be "a strong indicator" that § 922(g)(1) "fall[s] within a permissible category of regulations," *id.* at 1898, the absence of one is not fatal to § 922(g)(1). *Id.* at 1901 (noting that although "Section 922(g)(8) is by no means identical" to surety and going-armed laws, "it does not need to be"). Indeed, past lawmakers' decisions not to adopt a given regulation do not necessarily reflect doubts about its constitutionality. Rather, founding-era legislators are not presumed to have "maximally exercised their power to regulate"—a particular regulation may never have occurred to them, or they may have deemed it unwise for any number of reasons. *Id.* at 1925 (Barrett, J., concurring). Because § 922(g)(1) is "consistent with" founding-era laws and practices restricting the firearm possession of felons, it passes constitutional muster. *Id.* at 1898.

## IV. Section 922(g)(1) Is Not Susceptible to As-Applied Challenges and Is, at Minimum, Constitutional as Applied to Zherka

The government maintains that § 922(g)(1) is constitutional in all of its applications and is not susceptible to as-applied challenges. *Rahimi* does not undermine the government's position on this point. Rather, the Court was careful to not "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901. And it again described prohibitions on firearm possession by felons as "presumptively lawful." *Id.* at 1902. Consistent with the historical tradition discussed above, Congress may categorically disarm individuals convicted of felony offenses.

At a minimum, § 922(g)(1) is constitutional as applied to Zherka, whose prior fraud conviction constitutes a serious felony recognized as such at the founding, and which reflects "a grave offense demonstrating 'no respect for the truth or for his legal, let alone moral obligations to tell it.' " (Gov't Br. 24-25 (quoting JA 126)). Both those convicted of similarly serious crimes

and those presenting a similar future risk of misuse of firearms could be disarmed at the founding. *See Range* Pet. 13-16. That is enough; the government need not demonstrate a historical tradition of disarming those convicted of the same or similar crimes. Such a demanding standard would require a "historical twin" or "dead ringer," in direct contravention of *Rahimi* and *Bruen*. *See Rahimi*, 144 S. Ct. at 1898. It would also echo the errors of "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring).

This Court should affirm the district court's judgment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/ Lucas Issacharoff
LUCAS ISSACHAROFF
BENJAMIN H. TORRANCE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2737/2703
E-mail: lucas.issacharoff@usdoj.gov
         benjamin.torrance@usdoj.gov

cc: Counsel of record (via electronic filing)