# Cooper & Kirk

Lawyers
A Professional Limited Liability Company

| | | |
|---|---|---|
| Peter A. Patterson<br>ppatterson@cooperkirk.com | 1523 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036 | (202) 220-9600<br>Fax (202) 220-9601 |

July 19, 2024

**VIA ELECTRONIC FILING**
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals
  for the Second Circuit
Thurgood Marshall United
  States Courthouse
40 Foley Square
New York, New York 10007

Re:   Post-argument letter brief in *Zherka v. Garland*, No. 22-1108

Dear Ms. Wolfe,

We submit this letter brief, per the Court's order of June 26, 2024, to address how the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ---, 2024 WL 3074728 (June 21, 2024), bears on this case. To the extent *Rahimi* bears on this case at all, it only strengthens Zherka's claims.

## I. *Rahimi*'s Holding Does Not Support Disarming Nonviolent Felons For Life.

The Court's holding in *Rahimi* was a narrow one that in no way undermines Zherka's claims. *Rahimi* rejected a facial challenge to 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm for the duration of the restraining order. Rahimi's restraining order satisfied the requirements of Section 922(g)(8)(C)(i) because it "contain[ed] a finding

Catherine O'Hagan Wolfe
July 19, 2024
Page 2 of 10

that [he] pose[d] a credible threat to the physical safety of [his] intimate partner." *Rahimi*, 2024 WL 3074728, at *5. The Court found that this particular application of Section 922(g)(8) is constitutional, and it therefore rejected Rahimi's facial challenge to the statute.

*Rahimi*'s finding that Section 922(g)(8) is constitutional on its face does not support the Government's claim that Section 922(g)(1) is constitutional as applied to Zherka. *Rahimi* implicitly found that the text of the Second Amendment (which extends, under *District of Columbia v. Heller*, to "all Americans," 554 U.S. 570, 581 (2008)) was implicated, and it focused its analysis on "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," *Rahimi*, 2024 WL 3074728, at *6. Examining the historical record, the Court noted that although going back to "the earliest days of the common law" there were examples of laws that permitted disarming certain groups (including "political opponents [of the sovereign] and disfavored religious groups"), those laws were largely defunct by the Founding, with the exception of "regulations targeting individuals who physically threatened others." *Id.* at *7. Those latter laws came in "two distinct legal regimes." *Id.* There were "surety laws" which "provided a mechanism for preventing violence before it occurred" by requiring an individual who was found to pose a risk of violence to post sureties which would be forfeit in case of criminal violence, *id.* at *8, and "going armed laws" which "provided a

mechanism for punishing those who had menaced others with firearms" and punished "affray[ers]" with imprisonment and forfeiture of their arms, *id.* at *8–9. Putting those two regulatory strands together, the Court found that history proved "what common sense suggests," namely that: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at *9, 11.

That holding does not overlap with this case at all. Whereas Rahimi had been temporarily disarmed after a court found he posed a threat of future violence, in this case the Government would disarm Zherka *for life*, without any finding of dangerousness, based only on a conviction for making false statements to a bank and on his taxes. App'x A6. Just as before *Rahimi*, to support the application of Section 922(g)(1) to Zherka, the Government must show that the Second Amendment's text, as informed by history, supports permanent disarmament on the basis of a non-violent felony conviction. *Rahimi* does not help the Government at all in that effort. In fact, it undermines the Government's case.

## II. *Rahimi* Eviscerates the Government's Textual and Historical Arguments for Disarming Zherka.

While *Rahimi*'s holding was limited, its reasoning overlaps significantly with the arguments made by the Government in this case—arguments that must now be rejected as inconsistent with Supreme Court precedent.

In arguing to this Court that Section 922(g)(1) is constitutional as applied here, the Government made two primary arguments to justify disarming Zherka: (1) that "Zherka's felony fraud conviction ... places him outside the Second Amendment's scope" because, "[t]he Supreme Court in *Heller* defined the right to bear arms as limited to 'law-abiding, responsible citizens,' " Government's Brief, Doc. 79 at 10–11 (Dec. 14, 2022) (quoting 554 U.S. at 635) ("Gov't Br."), and (2) that in any event, there existed a historical tradition "of disarmament of those who demonstrated disobedience of the sovereign, whether or not that disobedience bore any relationship to violence or dangerousness," *id.* at 17.

*Rahimi*'s reasoning forecloses any argument that Zherka falls entirely outside the textual scope of the Second Amendment as a result of his criminal conviction. Recall that *Heller* read "the people" protected by the Second Amendment to refer to the same as the group of "people" with rights under the First and Fourth Amendments—"all Americans." 554 U.S. at 579, 581. Nevertheless, the Government argued (and the district court below found) that Zherka is not part of "the people" because he is not a "law-abiding, responsible citizen for Second Amendment purposes." Gov't Br. at 6; *see* App'x A123. In support of its narrower reading of the text, the Government points to *Heller*'s use of the phrase "law-abiding responsible citizens," at one point as a shorthand for individuals like the plaintiff in that case, Gov't Br. at 10 (quoting *Heller*, 554 U.S. at 635), and *Bruen*'s repetition

of the phrase and similar use of "law-abiding citizens" to describe petitioners in that case "no fewer than fourteen times," *see* Gov't Br. at 13. The Government takes those instances to have added a limitation on the scope of the Second Amendment. *Id.* at 11.

In this, the Government's brief in this case tracks an argument made by the Government in *Rahimi*. *Compare id.* at 10–11 *with* Br. for the United States at 11, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023) (relying on the same portions of *Heller, McDonald,* and *Bruen* to read the Second Amendment as limited to "law-abiding" and "responsible" citizens). But the Supreme Court decisively rejected that reading of its precedent, going out of its way at the end of the opinion to note that, although Rahimi could be disarmed because he posed a threat of physical violence, the government could not disarm him merely because he was not "responsible." *Rahimi*, 2024 WL 3074728, at *11. Noting that " '[r]esponsible' is a vague term [and i]t is unclear what such a rule would entail," the Court clarified that it had used the term "responsible" to describe the plaintiffs in *Heller* and *Bruen* merely as shorthand for "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term *and said nothing about the status of citizens who were not 'responsible.'* The question was simply not presented." *Id.* (emphasis added) (citations to some of the same portions of *Heller* and *Bruen* that the Government relies on here omitted). And as

Catherine O'Hagan Wolfe
July 19, 2024
Page 6 of 10

goes the "responsible" limitation, so goes the "law-abiding" one. *Heller* and *Bruen* used "responsible" and "law-abiding" in the same way (in many instances, together), and like "responsible" "law-abiding" is a vague and broad term (Can a habitual jaywalker be disarmed? Or a person with dozens of parking tickets?), and the Supreme Court has no more determined "the status of citizens who [are] not [law-abiding]" than it has those who are not "responsible." *Id.* As Justice Thomas explained in dissent, "[i]n reality, the 'law-abiding, dangerous citizen' test is the Government's own creation, designed to justify every one of its existing regulations. It has no doctrinal or constitutional mooring," and "[n]ot a single member of the Court adopts the Government's theory." *Id.* at *46 (Thomas, J., dissenting).

As such, following *Rahimi*, to justify disarming Zherka for life the Government must prove that applying the felon ban to a nonviolent offender "comport[s] with the principles underlying the Second Amendment." *Id.* at *6. Here again, *Rahimi* offers ample reason to reject the proposed principle that the Government can permanently disarm "those who demonstrated disobedience of the sovereign, whether or not that disobedience bore any relationship to violence or dangerousness." Gov't Br. at 17. Looking for support for this proposition, the Government first points to laws disarming Catholics in England before the Revolutionary War (claiming "their religious status was viewed as a proxy for ... disrespect for the law"), *see id.* at 18–19 (citation omitted), but *Rahimi* rejected reliance on the

Catherine O'Hagan Wolfe
July 19, 2024
Page 7 of 10

English practice of disarming "political opponents and disfavored religious groups," noting that it had been "largely eliminated ... on this side of the Atlantic" by the Founding, *Rahimi*, 2024 WL 3074728, at *7. The Government next relies on laws disarming Native Americans, Blacks, and indentured servants, which it admits are "repugnant" but claims are still useful to show the power of legislatures to "use status as a basis for disarmament." Gov't Br. at 18–19 & n.5. Such laws were not discussed in *Rahimi*[1] because the Government declined to rely on them before the Supreme Court, explaining "we think they were applications of a separate principle under the Second Amendment, which is that those who are not considered among the people can be disarmed." Tr. of Oral Argument at 53:15-19, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023). Such laws have no application here for the same reason.

After *Rahimi*, the only laws remaining with which the Government can attempt to justify disarming Zherka are those that stripped rights from people who refused to take loyalty oaths during the Revolutionary War, *see* Gov't Br. at 20, certain unadopted proposals for Second Amendment analogues in state constitutions, *see id.* at 21–22, and the claim that felons at the Founding faced "estate

---

[1] Except by Justice Thomas in dissent who called them "cautionary tales" "warn[ing] that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey." *Rahimi*, 2024 WL 3074728, at *47 (Thomas, J., dissenting).

forfeiture and death," so, by comparison, the mere loss of the Second Amendment right is necessarily acceptable, *see id.* at 22–23. There was ample reason to reject reliance on those laws to support disarming nonviolent felons before *Rahimi,* and those reasons remain applicable. *See, e.g., Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *cert. granted, judgment vacated*, 2024 WL 3259661 (U.S. July 2, 2024) (rejecting the claim that past felony punishments excused lifetime disarmament because "[t]he greater does not necessarily include the lesser"); *Folajtar v. United States*, 980 F.3d 897, 914–15 (3d Cir. 2020) (Bibas, J., dissenting) ("To ensure peace and safety, the colonies had to disarm [loyalists]," and describing evidence from state ratifying proposals as "thin and mostly consistent with focusing on dangerousness."); *Kanter v. Barr*, 919 F.3d 437, 454–56 (7th Cir. 2019) (Barrett, J., dissenting) (discussing proposed Second Amendment analogues in detail and noting that none were adopted and all were concerned "not [with] felons in particular or even criminals in general" but with "threatened violence and the risk of public injury"). To be sure, *Rahimi* engaged in a form of greater-includes-the-lesser reasoning, stating that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 2024 WL 3074728, at *10. But that reasoning does not help the Government here, because whatever the reasons for authorizing a prison sentence for

Zherka's offense, they are wholly disconnected from any risk of his "us[ing] guns to threaten the physical safety of others." *Id.* And that sinks the Government's case. By suggesting that *the only* disarmament regimes to continue past the adoption of the Second Amendment were those "targeting individuals who physically threatened others," *id.* at *7, *Rahimi* adopted a reading of the available history that does not support disarming Zherka on the basis of his conviction.

\*     \*     \*

*Rahimi* emphasized that one pitfall courts must avoid in analyzing a law under the *Bruen* framework is requiring a "historical twin" by too narrowly analyzing both the "how" and the "why" of modern and historical regulations and finding fault wherever laws differ in their particulars from historical practice. *Rahimi*, 2024 WL 3074728, at *10 (quoting *Bruen*, 597 U.S. at 30). But *Bruen* made equally clear that courts could err in the other direction as well, and it is also wrong to "uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." 597 U.S. at 30 (cleaned up). The record in this case shows that the risk here lies in the latter error, not the former. The Government has not identified a single historical law that would support disarming an individual merely because he has a prior criminal conviction that is not in any way indicative of a threat of physical danger to others. And its arguments against Zherka's as-applied challenge rest on several

Catherine O'Hagan Wolfe
July 19, 2024
Page 10 of 10

premises that have now been explicitly rejected by the Supreme Court. This Court should reverse the decision below and direct judgment be granted in Zherka's favor in light of *Rahimi*.

    Sincerely,

    s/Peter A. Patterson
    Peter A. Patterson
    COOPER & KIRK, PLLC
    1523 New Hampshire Ave., N.W.
    Washington, DC 20036
    ppatterson@cooperkirk.com
    Tel: (202) 220-9600
    Fax: (202) 220-9601

    *Attorney for Appellant*