

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

November 15, 2024

<u>By electronic filing</u>

Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

   Re:  *Zherka v. Garland*, No. 22-1108
         Oral argument held May 8, 2023, before Judges Newman, Lynch, and Pérez

Dear Ms. Wolfe:

The government respectfully submits this supplemental letter brief in response to the Court's October 28, 2024, order directing the parties to address the effect of *Antonyuk v. James*, No. 22-2908(L), 2023 WL 11963034 (2d Cir. Oct. 24, 2024) ("*Antonyuk II*"), on this case. In *Antonyuk II*, this Court considered the constitutionality of several portions of New York's Concealed Carry Improvement Act ("CCIA")—specifically, those relating to licensing requirements, including in particular the "good moral character" requirement and the attendant requirement of disclosure of social media accounts; sensitive locations, including healthcare facilities, places of worship, zoos and public parks, locations where alcohol is consumed, event spaces, and places where individuals exercise their right to assembly; and restricted locations on private property.

*Antonyuk II* was decided on remand from the Supreme Court, which had vacated the same panel's decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir.

2023) ("*Antonyuk I*"), for further consideration following *United States v. Rahimi*, 144 S. Ct. 1889 (2024). *Antonyuk II* concluded that *Rahimi* had "little direct bearing" on *Antonyuk*, as *Rahimi*, unlike *Antonyuk*, concerned "a criminal prohibition of firearms possession by a particular class of individuals based on a prior judicial adjudication." *Antonyuk II* at *2. Because the current case does address such a prohibition, *Rahimi* is of greater relevance here than *Antonyuk II*. But *Antonyuk II* also noted that *Rahimi* provided helpful "analysis of the considerations and methodology" to apply in Second Amendment cases, in particular "the role of history in interpreting the Second Amendment," which "clarified to some degree the meaning and effect of [the Supreme Court's] prior decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022)." *Antonyuk II* at *2. *Antonyuk II*'s explanation of the *Bruen* framework, as clarified by *Rahimi*, emphasizes the flexibility of the historical inquiry, accounting for changing circumstances rather than creating a law "trapped in amber." *Antonyuk II*, like *Rahimi*, also undermines the rigid historical inquiry urged by Zherka.

Overall, *Antonyuk II*'s application of the *Rahimi/Bruen* framework supports the government's use of similarly analogous historical examples in support of the constitutional validity of 18 U.S.C. § 922(g)(1). This historical evidence confirms the outcome also required under binding precedent: "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013); *see also, e.g.*, *Rahimi*, 144 S. Ct. at 1901-

02 (giving effect in two different places to the Supreme Court's prior pronouncements regarding the presumptive constitutionality of felon-dispossession laws). The district court's judgment should accordingly be affirmed.

### I. *Antonyuk II* Clarified the Analytical Framework Governing Second Amendment Challenges

*Antonyuk II* clarified the analytical framework for Second Amendment challenges established by *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 597 U.S. 1 (2022); and *Rahimi*, 144 S. Ct. 1889 (2024). These cases "require[] courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk II* at *14 (quoting *Bruen*, 597 U.S. at 19).

*Antonyuk II*, like *Rahimi* and *Bruen*, focused primarily on history and tradition, which "give content to the indeterminate and underdetermined text of the Second Amendment" and "inform the meaning of the pre-existing right to keep and bear arms." *Id.* (quotation marks and alterations omitted). Several implications follow from that methodology, some of which may affect this case.

"First, when used to interpret text, 'not all history is created equal.'" *Antonyuk II* at *14 (quoting *Bruen*, 597 U.S. at 34). Courts should focus on history roughly contemporaneous with the enactment of the Second and Fourteenth Amendments, rather than practices that long predate or postdate the relevant text.

In addition, certain sources such as military decrees, territorial law, and local law may be relevant but cannot overcome the weight of other historical evidence. *Id.*

"Second, in examining history and tradition, a court must identify the 'societal problem' that the challenged regulation seeks to address, and then ask 'whether the challenged regulation is consistent with the principles that underpin our regulatory tradition' for firearms." *Id.* (quoting *Bruen*, 597 U.S. at 26-27; *Rahimi*, 144 S. Ct. at 1898). Notably, *Antonyuk II* frames this inquiry by reference to *Rahimi*'s discussion of "principles," rather than the narrow focus on precisely analogous historical practices urged by Zherka. (Gov't Br. 23 (discussing *Bruen*'s requirement of historical analogues, not twins)).

"Third, the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Antonyuk II* at *15. "Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky; it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Id.* This observation is particularly relevant to 18 U.S.C. § 922(g)(1). Although the government has acknowledged the absence of identical 18th and 19th century felon-disarmament laws, that must be understood against the background of commonplace laws authorizing capital punishment and estate forfeiture for felony offenses. (Gov't Br. 22-25). The absence of felon disarmament laws for those felons who avoided more

permanent forms of disarmament might therefore "'have reflected a lack of political demand rather than constitutional limitations.'" *Antonyuk II* at *15 (quoting *Binderup v. Attorney General*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments)).

"Fourth, courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Id.* As the Court explained, although the absence of analogous historical precedent had doomed New York's proper-cause requirement at issue in *Bruen*, "that was due to the exceptional nature of New York's proper-cause requirement, which conditioned the exercise of a federal constitutional right on the right holder's reasons for exercising the right." *Antonyuk II* at *15. The Court noted that a "'more nuanced approach' will often be necessary in cases challenging less exceptional regulations, including in cases concerning 'new circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 27-28). At least two changing circumstances are relevant here: the decline in capital punishment for felons since the time of the founding (and the consequent larger number of felons in the population at large), and the "increasingly lethal guns in increasingly populous cities" that mark the post-Civil War era, *id.* at *32.

"Fifth, under the more nuanced approach, the 'historical inquiry that courts must conduct will often involve reasoning by analogy.'" *Id.* at *15 (quoting *Bruen*, 597 U.S. at 28). As *Antonyuk II* noted, *Rahimi* upheld "an extremely recent [1994] addition to the federal criminal code" that prohibited "firearm possession by

individuals with civil protection orders resulting from domestic violence," orders which themselves are a "relatively recent legal innovation." *Antonyuk II* at *16. But "the [Supreme] Court was untroubled by the absence of . . . a close analogue" from the 18th or 19th centuries. *Id.* Instead, it relied on the broader observation that "various laws from the 18th century and earlier authorized the prohibition of firearm possession by persons identified by legislatures and courts as dangerous to others," concluding that § 922(g)(8) was "'sufficiently similar'" to that historical tradition that it passes constitutional muster. *Id.* (quoting *Rahimi*, 144 S. Ct. at 1902-03). Here, § 922(g)(1)'s felon-dispossession provision dates back further than that in *Rahimi*, having been enacted in its modern form in 1968 and with roots in the Federal Firearms Act of 1938 as well as earlier state enactments. *See generally United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). While § 922(g)(1) may too lack a "historical twin" from the 18th or 19th centuries, the history of firearms laws and felony punishment laws amply demonstrates its consistency with this nation's historical tradition. (Gov't Br. 17-25).

"Sixth, just as the existence *vel non* of a *distinctly similar* historical regulation is not dispositive, it is likewise not dispositive whether *comparable* historical regulations exist in significant numbers. . . . [D]epending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk II* at *16-17. The Court should accordingly reject any argument that the government must identify additional felony punishment or firearm dispossession laws beyond those already collected.

Seventh, both 1791 and 1868 are relevant for considering historical analogues. *Id.* at \*17-19. A state law was at issue in *Antonyuk*, making the period close to the Fourteenth Amendment's ratification relevant there. *Id.* But the Court observed that *Rahimi* (which addressed a federal law) expressly left open the question of whether the "scope of the right against the Federal Government" should be considered by reference to 1868 as well as 1791, *id.* at \*17 (citing 144 S. Ct. at 1898 n.1)—a question *Bruen* also declined to decide, while noting that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," 597 U.S. at 37. Considering those decisions, and noting that other courts of appeals have considered both 1791 and 1868 to be the relevant periods, the Court concluded that both periods were pertinent to the analysis in that case of the scope of the Second Amendment right and the nation's tradition of firearms regulation. *Antonyuk II* at \*18-19.

## II. *Antonyuk II*'s Analysis of the CCIA Supports the Constitutionality of § 922(g)(1)

Beyond the broad principles elucidated by *Antonyuk II*, their specific application to the challenged provisions of the CCIA supports the government's arguments here. Most directly relevant is the good moral character provision, the application of which the Court upheld with specific reference to permitting regimes that deny permits to persons who are not law-abiding. *Antonyuk II* at \*25 & nn.28-32. Also relevant are the Court's analysis of the CCIA's sensitive places provisions, which cast broadly for historical analogues that demonstrated relevant principles.

Finally, those provisions of the CCIA that the Court found likely unconstitutional—the social media disclosure and restricted location provisions—are inapposite and unhelpful to Zherka.

### A. *Antonyuk II*'s Analysis of the Good Moral Character Requirement Supports the Constitutionality of § 922(g)(1)

New York Penal Law § 400.00(1)(b) states that "[n]o license shall be issued or renewed except for an applicant . . . of good moral character," which the CCIA defines as having "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."[1] Although the *Antonyuk II* Court confronted a facial challenge to this provision—and thus needed to identify only one constitutional application, *see Antonyuk II* at *24-25—it proceeded to analyze the provision by comparison to the permitting regimes of other states, which also provide support for the constitutionality of 18 U.S.C. § 922(g)(1).

The *Antonyuk II* Court noted that the Supreme Court "has approved of 'shall-issue' licensing regimes that deny firearms licenses to individuals who lack good moral character in the sense that they are not law-abiding and responsible and pose a danger to the community if licensed to carry firearms in public." *Id.* at *25. The Court cited footnote nine of the *Bruen* decision, which the government has also

---

[1] That definition corresponds neatly with the Supreme Court's characterization of the purpose of 18 U.S.C. § 922(g)(1). *See Small v. United States*, 554 U.S. 385, 394 (2005) ("Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (quotation marks omitted)).

identified as providing support for § 922(g)(1). (Gov't Br. at 14-16 & nn.2-4). While the Court noted that "[w]hether the relevant tradition is *limited* to dangerousness, or more broadly permits the disarmament of *all* law-breakers or 'unvirtuous' individuals is the subject of considerable debate," *id.* at *25, the government's brief has shown that "many of the 'shall-issue' regimes approved of by *Bruen* independently prohibit the issuance of licenses to felons regardless of the nature of the felony." (Gov't Br. at 15 n.4 (collecting state statutes)).

Two other features of *Antonyuk II*'s analysis render these licensing regimes pertinent to § 922(g)(1). First, the Court rejected the idea that, in considering historical evidence, courts should sharply delineate between permitting regimes like the CCIA and prohibitory criminal laws like § 922(g)(1). "*Rahimi* strongly suggests that what matters in the search for historical antecedents of modern firearms regulations is the *substance* of the regulation, rather than the *form*." *Antonyuk II* at *36. *Rahimi* had upheld the criminal prohibition in § 922(g)(8) based in part upon surety laws, which relied on magistrates' orders restraining gun possession, and going-armed laws, which imposed forfeiture on those convicted of crimes—mechanisms very different from § 922(g)(8)'s criminal sanction or the civil protection order that triggers it. *Id.* The same logic applies to § 922(g)(1).

Second, the Court rejected the idea that the post-Civil War municipal firearms ordinances cited by the state were insufficiently representative or of too-recent vintage. *Id.* at *30-33. The Court noted that numerous historical developments contributed to the rise of municipal firearms regulation in this era,

including rapid urbanization and its "greater concern about interpersonal violence," *id.* at \*31; "the increased lethality of firearms in the latter decades of the nineteenth century," *id.*; and "the development of governance institutions that were more tightly organized, specialized, and bureaucratic than those required by the towns of the late eighteenth and early nineteenth centuries," *id.* at \*32. Given these developments, the Court held that the legislation and regulation that proliferated in the late nineteenth century—including many of the permitting regimes cited with approval by *Antonyuk II* and described as permissible "shall-issue" regimes in *Bruen*—formed part of this nation's historical tradition of firearms regulation. *Id.* at \*32-33; *see id.* at \*28 n.37. This also strongly supports the idea that the similar century-old tradition of disarming felons, which arose in response to the same changing societal conditions and concerns, forms part of the relevant historical tradition. (Gov't Supp. *Rahimi* Br. at 5-6).

### B. *Antonyuk II*'s Discussion of Sensitive Places Supports the Constitutionality of § 922(g)(1)

Although the Court's discussion of sensitive places is not as directly applicable to § 922(g)(1), its analysis nevertheless cautions against Zherka's cramped view of relevant historical analogues. For example, the Court considered laws prohibiting guns in schools, which demonstrated a historical tradition of "prohibiting firearm carriage for the protection of vulnerable populations." *Antonyuk II* at \*48. And it looked to laws prohibiting those with mental illness or alcohol addiction from joining militias, finding that they demonstrate that those groups have "historically been considered to make up a vulnerable population

justifying firearm regulation." *Id*. Taken together, "the relevantly similar feature of these analogues is the *how* and the *why*: firearm prohibition (how) in places frequented by and for the protection of vulnerable populations (why)." *Id*. at *49.

Here, too, the how and the why of § 922(g)(1) align with historical analogues. The government has pointed to numerous laws evincing the same "how" (disarmament) and the same "why": because the restricted persons cannot be trusted to obey civil authority and use firearms safely. The government has cited various restrictions governing, for example, those who refused to sign loyalty oaths or those who defamed civil authority. (Gov't Br. at 18-23; Gov't Supp. *Rahimi* Br. at 4-8). That these laws operated to restrict somewhat different groups of the civilly disobedient in somewhat different ways is thus not a distinction that justifies rejecting their applicability to § 922(g)(1).

### C. The Provisions Rejected by *Antonyuk II* Have Limited Relevance to § 922(g)(1)

*Antonyuk II* upheld injunctions against two aspects of the CCIA.[2] First, the Court determined that requirement of disclosure of social media handles was likely unconstitutional. This analysis, however, sounded far more in the First Amendment tradition of anonymity in public speech than in any Second Amendment principle applicable to § 922(g)(1). *Antonyuk II* at *40-41. Second, the Court concluded that the restricted locations provision was likely unconstitutional as applied to private

---

[2] The Court also left in place a prior limited injunction regarding places of worship as applied to one plaintiff's church; however, this was solely based upon the Free Exercise Clause rather than the Second Amendment. *See Antonyuk I*, 89 F.4th at 346.

property held open to the public. This restriction—which functionally would have placed sharp limits on the ability of law-abiding, responsible citizens to carry weapons in public—is far closer to the restrictions invalidated in *Heller*, *McDonald*, and *Bruen* than to the specific adjudication-based restriction at issue here and upheld in *Rahimi* (or the good moral character requirement upheld in *Antonyuk II* itself). *Antonyuk II* at *75-78.

The CCIA requires an applicant to "submit . . . a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicant[']s character and conduct." N.Y. Penal L. § 400.00(1)(o)(iv). The Court held that this condition was without historical precedent, and thus upheld the injunction against it. *Antonyuk II* at *40-41. The substance of the Court's analysis, however, focused on the First Amendment tradition of pseudonymous speech. *Id.* at *40 ("To require disclosure of handles is thus to demand that applicants effectively forfeit their right to pseudonymous speech on social media (where so much speech now takes place)."). Zherka's as-applied challenge does not implicate any similar First Amendment concerns, and there is a robust historical tradition of disarmament (or more) based upon conduct, including Zherka's fraud-type offenses.

The CCIA also prohibits possession of a weapon in a restricted location without the owner's affirmative consent via clear and conspicuous signage. "The effect of this 'restricted location' provision is to create a default presumption that carriage on any private property is unlawful—whether property is open or closed to

the public—unless the property owner has indicated by 'clear and conspicuous signage' or express verbal consent that carriage is allowed." *Antonyuk II* at *74. The Court found that the state had failed to supply any sufficiently analogous historical precedents to the restriction as to property held open to the public, because all of the state's precedents restricted possession of firearms on private property closed to the public. *Id.* at *78. The statute thus "functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights." *Id.* "That burden is entirely out of step with that imposed by the proffered analogues, which appear to have created a presumption against carriage only on private property not open to the public." *Id.* That type of blanket impingement upon the right to keep and bear arms is akin to the type of broad default that was rejected in *Bruen*, and to the blanket restrictions on handgun possession rejected in *Heller* and *McDonald*. By contrast, the Court, although it remanded for further consideration of the restricted locations provision as applied to closed property, signaled that the historical precedents cited by the state did establish a tradition of preventing the carrying of firearms on private property closed to the public. *Id.*

Section 922(g)(1) has no bearing upon free speech and does not create a default presumption against keeping or bearing arms by the general law-abiding public. Rather, it prohibits those who have demonstrated serious disrespect for the law (similar to those who would fail the good moral character requirement) based upon past adjudication (much like § 922(g)(8), at issue in *Rahimi*) from possessing

firearms. Section 922(g)(1) is thus consistent with the principles drawn from this nation's historical tradition of firearms regulation.

This Court should affirm the district court's judgment.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

By:    /s/ Lucas Issacharoff
        LUCAS ISSACHAROFF
        BENJAMIN H. TORRANCE
        Assistant United States Attorneys
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.: (212) 637-2737/2703
        E-mail: lucas.issacharoff@usdoj.gov
                benjamin.torrance@usdoj.gov

cc: Counsel of record (via electronic filing)