**22-1108-cv**
*Zherka v. Bondi*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————————

August Term, 2022

(Argued: May 08, 2023     Decided: June 9, 2025)

Docket No. 22-1108-cv

————————————

SELIM ZHERKA, "SAM,"

*Plaintiff-Appellant,*

— v. —

PAMELA BONDI, Attorney General of the United States, in her official capacity,

*Defendant-Appellee.*[*]

————————————

Before:

NEWMAN, LYNCH, and PÉREZ, *Circuit Judges.*

————————————

————————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

1

Appellant, who was convicted of a nonviolent financial felony, brings a Second Amendment and Fifth Amendment challenge to the felon-in-possession law, 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms. He argues that because he was convicted only of a nonviolent financial felony, Congress cannot deprive him of his right to bear arms. He further asserts that because he has a constitutional right to bear arms, he also has a due process right to an individual assessment of dangerousness before the government can deprive him of his Second Amendment rights. Appellant now appeals the Southern District of New York's (Halpern, *J.*) dismissal of his claims. His appeal fails because (1) the Second Amendment does not prohibit Congress from disarming convicted felons; and (2) he has no right to individualized process prior to the application of a categorical criminal prohibition.

AFFIRMED.

——————————

PETER A. PATTERSON, Cooper & Kirk, PLLC, Washington, DC (Anthony G. Piscionere, Piscionere & Nemarow, P.C., Rye, NY, *on the brief*), *for Plaintiff-Appellant*.

LUCAS ISSACHAROFF, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York *for Defendant-Appellee*.

——————————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellant, Selim Zherka, filed a lawsuit in the United States District Court for the Southern District of New York against the Attorney General (the "government"), alleging violations of his Second and Fifth

2

Amendment rights. He asserts that 18 U.S.C. § 922(g)(1)'s prohibition of the possession of firearms by a convicted felon is unconstitutional as applied to him because he was not convicted of a violent felony. He also argues that because he has a constitutional right to bear arms, the federal government cannot, without an individualized assessment of his dangerousness, deprive him of firearms. Appellant seeks a declaration that Section 922(g)(1) is unconstitutional as applied to him and a permanent injunction enjoining the government from preventing him from possessing a firearm in his home.

The district court (Philip M. Halpern, *J.*) dismissed Appellant's claims, concluding that Section 922(g)(1) is constitutional as applied to him and that he has no right to a hearing prior to the adoption or application of a categorical prohibition. We agree and therefore AFFIRM the judgment of the district court.[1]

## BACKGROUND

We take the following facts from documents of which we can take judicial notice and the operative complaint, which we accept as true, and we draw all

---

[1] Zherka filed a notice of appeal on May 20, 2022. We delayed adjudication of this case pending the Circuit's resolution of *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), which was not completely resolved until this Court's second decision, on remand from the Supreme Court on October 24, 2024.

3

reasonable inferences in Zherka's favor. *See, e.g.*, *Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023).

## I. The Underlying Felony Conviction

On December 22, 2015, Zherka pleaded guilty to one count of conspiracy to make a false statement to a bank and to sign and file a false federal income tax return in violation of 18 U.S.C. § 371.[2] Although Zherka's offense conduct was nonviolent, his crime was serious; he defrauded federally insured banks of tens of millions of dollars and flouted the tax laws of this country to the tune of over one million dollars in tax loss. Zherka was sentenced to 37 months' imprisonment and three years of supervised release, and ordered to pay approximately $8.5 million in fines, restitution, and forfeiture. As a condition of his supervised release, he was prohibited from possessing a firearm. He completed his term of incarceration on May 26, 2017, and his term of supervised release expired on May 26, 2020. Accordingly, Section 922(g)(1), and the New York State licensing regime,[3] which

---

[2] A violation of 18 U.S.C. § 371 is a class D felony.

[3] Zherka alleges that prior to his conviction, he "was licensed to carry a firearm in New York, Connecticut, Florida and Pennsylvania," but that after his conviction he has no "recourse to obtain a firearms license." App'x at 10–11. We therefore assume that Zherka does not currently have a valid New York firearms license. For an account of the New York licensing regime, see *Antonyuk v. James*, 120 F.4th 941, 955–58 (2d Cir. 2024).

Zherka does not challenge, are the only legal impediments to his possession of a firearm.

## II.     Procedural History

On September 11, 2020, Zherka sued the Attorney General seeking declaratory and injunctive relief from claimed violations of his constitutional rights. First, he asserts that Section 922(g)(1) is unconstitutional as applied to someone like him who has been convicted only of a nonviolent felony. Second, he alleges that because he has a constitutionally protected liberty interest in the right to bear arms, the federal government must provide an opportunity for him to restore that interest by an individualized assessment of his dangerousness. As an example of the type of process that he claims is due to him, Appellant points to 18 U.S.C. § 925(c), which permitted a convicted felon to apply to the Attorney General to restore his right to bear arms by showing that he is not dangerous to public safety. [4]

On the government's motion, the district court dismissed Zherka's complaint. *See Zherka v. Garland*, 593 F. Supp. 3d 73, 82 (S.D.N.Y. 2022). On the

_____

[4] Section 925(c) has not been repealed. Nevertheless, it is currently without practical effect because, as described more fully below, Congress has repeatedly defunded the administrative apparatus necessary to implement the statute since 1992.

Second Amendment issue, it applied our then-prevailing two-step test for

assessing the constitutionality of gun restrictions. *Id.* at 77–80. Under that test, a

court first had to "determine whether the challenged legislation impinges upon

conduct protected by the Second Amendment," as informed by the

Amendment's text and history. *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir.

2018) (internal quotation marks omitted). Only if the challenged legislation

impinged upon protected conduct would the court then "determine the

appropriate level of scrutiny to apply and evaluate the constitutionality of the

law using that level of scrutiny." *Id.* Relying on the Supreme Court's assurance

that "longstanding prohibitions on the possession of firearms by felons" are

"presumptively lawful," *District of Columbia v. Heller*, 554 U.S. 570, 626–27, 627

n.26 (2008), the district court concluded, at the first step of the test, that Section

922(g)(1) is constitutional as applied "to individuals convicted of non-violent

financial felonies," *Zherka*, 593 F. Supp. 3d at 77–80.

The district court also rejected Zherka's due process claim, reasoning that

it was foreclosed by *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1

(2003). *See Zherka*, 593 F. Supp. 3d at 80–81. In that case, the Supreme Court

determined that Connecticut did not violate the plaintiffs' procedural due

6

process rights when it required them, as convicted sex offenders, to enroll in a publicly available registry without first receiving an individualized hearing on whether they were dangerous to the public. *See Conn. Dep't Pub. Safety*, 538 U.S. at 4–8. The Court explained that the registration requirement was based "on the fact of previous conviction, not the fact of current dangerousness" and that procedural due process does not require a hearing to prove or disprove a particular set of facts that are ultimately irrelevant under the challenged statute. *Id.* at 4. Likewise in this case, the district court concluded that Zherka has no procedural due process right to a hearing on the risk of danger he poses because Section 922(g)(1) applies based on the fact of his previous conviction, rather than on an individualized finding that he poses a current danger to the public. *See Zherka*, 593 F. Supp. 3d at 80–81.

Zherka filed his appeal on May 20, 2022. Shortly thereafter, on June 23, 2022, the Supreme Court issued its decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), repudiating the two-step framework for analyzing Second Amendment challenges that this circuit, and every other regional circuit, had applied. *Id.* at 17. In response, Zherka argues that we should vacate the district court's decision and remand the case for further consideration

7

under the *Bruen* standard. He alternatively asserts that the government has failed

to meet its *Bruen* burden of demonstrating that there is a history and tradition of

regulating firearms in this country in a manner that is analogous to Section

922(g)(1). In other words, he contends that there is no historical analogy to Section

922(g)(1). The government, in response, argues that nothing in *Bruen* alters the

district court's conclusion that Zherka, by virtue of his felony conviction, falls

outside the scope of the Second Amendment's protections and that we should,

therefore, affirm the lower court's decision.

## LEGAL STANDARDS

### I.      Standard of Review

"We review *de novo* a district court's grant of a defendant's motion to

dismiss, accepting all factual allegations in the complaint as true, and drawing all

reasonable inferences in the plaintiff's favor." *City of Pontiac Gen. Emps.' Ret. Sys. v.*

*MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) (internal quotation marks omitted).

### II.     Second Amendment Principles

In a quartet of cases starting with *Heller* in 2008, the Supreme Court has

interpreted the Second Amendment right to keep and bear arms in the context of

challenges to firearm regulations. *See Antonyuk v. James*, 120 F.4th 941, 960–68 (2d

Cir. 2024). Three of those four cases have limited applicability to this case because they concerned regulations that were outliers in the breadth of their restrictions on the rights of law-abiding citizens to possess and carry firearms.[5] Only *United States v. Rahimi*, 602 U.S. 680 (2024), dealt with an arguably analogous statute that restricted the possession of firearms by a category of putatively non-law-abiding persons.[6] We provided a detailed and comprehensive summary of all four cases in *Antonyuk*, 120 F.4th at 960–68. Here, we briefly summarize the *Bruen* standard for analyzing Second Amendment challenges and note the most relevant lessons derived from the Supreme Court's other twenty-first century Second Amendment cases.

---

[5] *See Heller*, 554 U.S. at 573, 629, 635 (determining that a District of Columbia "prohibition on the possession of usable handguns in the home violates the Second Amendment" and explaining that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"); *McDonald v. City of Chicago*, 561 U.S. 742, 749–50 (2010) (holding that the "Second Amendment right is fully applicable to the States" and striking down a Chicago regulation that was similar to the D.C. firearm regulation in *Heller*); *Bruen*, 597 U.S. at 8–11, 14 (striking down New York's former "may-issue" firearm licensing regime pursuant to which an applicant could obtain a public-carry license only if he "demonstrate[d] a special need for self-defense" and explaining that only five other states had similar licensing regimes, whereas 43 states had licensing regimes that did not require demonstrating a special need); *id.* at 79 (Kavanaugh, J., concurring) (characterizing New York's licensing regime as "unusual").

[6] In *Rahimi*, the Supreme Court upheld 18 U.S.C. § 922(g)(8), a federal statute that criminalizes the possession of firearms by an individual subject to a particular type of restraining order. 602 U.S. at 684–86, 702.

Under *Bruen*, a court assessing firearm regulations must first consider whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct." *Id.* The burden then shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* At this step of the *Bruen* analysis, the government is tasked with identifying historical analogues that demonstrate a "tradition of regulation" that is comparable to the challenged law. *Id.* at 27. In short, the text of the Second Amendment and the history of firearms regulation in this country are the guiding lights for adjudication of a Second Amendment challenge to a firearm regulation. *Id.* at 19.

A few other principles from the quartet of Second Amendment cases are worth highlighting. First, the Supreme Court has never repudiated *Heller*'s assurance that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." 554 U.S. at 626–27, 627 n.26.[7] Second, the Court has

---

[7] Indeed, several Justices who joined the *Bruen* majority opinion emphasized, in separate opinions, that they did not regard that decision as inconsistent with *Heller*'s assurance. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring). The dissenters also posited that the Court's opinion cast no doubt on *Heller*'s assurance. *See id.* at 129–30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).

10

struck down only firearms laws that overly restrict the rights of "law-abiding, responsible citizens" to own and possess guns. *Id.* at 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 749–50 (2010); *Bruen*, 597 U.S. at 8–11, 15, 26, 29. *Rahimi* is the only instance in which the Court has reviewed a law that criminalizes firearms possession by potentially dangerous individuals, and there, the Court upheld the constitutionality of Section 922(g)(8) both facially and as applied. *See* 602 U.S. at 690. And third, the historical analogues that could support a tradition of firearm regulation do not have to be "dead ringer[s]" for the challenged regulation, especially when the challenged regulation addresses new circumstances. *Id.* at 692 (internal quotation marks omitted).

## DISCUSSION

## I.     **This Appeal Is Ripe for Decision.**

Zherka first argues that we should vacate and remand for the district court to consider his claims under the *Bruen* standard, since that case repudiated the former two-step standard that the district court applied. "While generally we decline considering arguments not addressed by the district court, this is a prudential rule we apply at our discretion." *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012) (internal citation omitted). "In determining whether to consider such

11

issues, we rely on a number of factors, including the interests of judicial economy, and whether the unaddressed issues present pure questions of law." *Id.* (internal citation omitted).

Zherka points, in part, to *Taveras v. New York City*, No. 21-398, 2022 WL 2678719 (2d Cir. July 12, 2022) and *Sibley v. Watches*, No. 21-1986, 2022 WL 2824268 (2d Cir. July 20, 2022), two non-precedential summary orders, to support his argument for vacatur and remand. In both *Taveras* and *Sibley*, we vacated and remanded Second Amendment challenges to gun regulations, with little to no analysis, for the district courts to reconsider in light of *Bruen*. *See Taveras*, 2022 WL 2678719, at *1; *Sibley*, 2022 WL 2824268, at *1.

In both of those cases, however, the parties had fully briefed their positions and we had held oral argument prior to *Bruen*. Here, in contrast, the parties submitted their briefs and offered oral argument after the Supreme Court decided *Bruen*. We therefore have the full benefit of the parties' respective *Bruen*-based arguments before us. It would be inconsistent with the interests of judicial economy to remand this case to the district court, only for the parties to brief the same legal issues again.

12

Moreover, there are no relevant unsettled questions of fact in this case. [8] The parties dispute only whether certain historical analogues establish a history and tradition of firearms regulation in this country sufficient to uphold Section 922(g)(1). That dispute raises only questions of constitutional interpretation, which we review *de novo. See United States v. Doka*, 955 F.3d 290, 293 (2d Cir. 2020) ("We review *de novo* questions of law, including questions of constitutional interpretation."). In the absence of material questions of fact, we are just as well equipped as the district court to resolve the outstanding legal issues in this case. Accordingly, we decline to vacate and remand. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418–19 (2d Cir. 2001) (declining to vacate and remand a case that presented a purely legal issue, even though the district court had not reached that legal issue).

## II.    *Bogle* Remains Good Law After *Bruen.*

Prior to the Supreme Court's decision in *Bruen*, we had upheld Section 922(g)(1) as facially constitutional. *See United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013). In *Bogle*, we rejected a facial challenge to Section 922(g)(1), relying on the assurances in *Heller* and *McDonald* that "longstanding prohibitions on the possession

---

[8] The parties disagree about whether Zherka is currently dangerous. Because we conclude that Congress has the authority to disarm all felons, we need not resolve that factual dispute.

of firearms by felons" are presumptively constitutional. *Id.* at 281, quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786. Contrary to the government's assertion here, we did not conclude that "felons as a class are not among the law-abiding citizens protected by the Second Amendment." Appellee's Br. 11. We simply held that Section 922(g)(1) is a "constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281–82.

Our holding in *Bogle* survives *Bruen*. "To mount a successful facial challenge" to Section 922(g)(1), a litigant "must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." *Antonyuk*, 120 F.4th at 983 (alterations adopted) (internal quotation marks omitted). As we determined in *Bogle*, that cannot be done.

In *Antonyuk*, a case that post-dated *Bruen*, we upheld New York's "good moral character" licensing requirement, which required licensees to possess the character necessary to "be entrusted with a weapon and to use it only in a manner that does not *endanger oneself or others*." 120 F.4th at 985 (emphasis in original), quoting N.Y. Penal L. § 400.00(1)(b). In that decision, we explained that the Supreme Court in *Bruen* had expressly approved licensing regimes that defined "good moral character" similar to New York's definition. *Id.* at 983–85. By that same reasoning,

14

Section 922(g)(1) is capable of constitutional application to a broad range of felons, whose record of *violent* behavior or prior misuse of firearms would manifestly make them liable to being disarmed under that standard.[9] It therefore cannot be said that "no set of circumstances exists under which the law would be valid," *id.* at 983, and *Bogle*'s rejection of a facial challenge to the statute remains good law in this Circuit.

Other Circuit Courts have also held that neither *Bruen* nor *Rahimi* abrogated their prior precedent holding Section 922(g)(1) facially constitutional on the basis of the continued vitality of *Heller* and *McDonald*'s assurances. *See United States v. Duarte*, --- F.4th ---, 2025 WL 1352411, at *4–6 (9th Cir. 2025) (en banc); *Vincent v. Bondi*, 127 F.4th 1263, 1264–66 (10th Cir. 2025); *United States v. Hunt*, 123 F.4th 697, 703–04 (4th Cir. 2024); *United States v. Hester*, No. 23-11938, 2024 WL 4100901, at *1 (11th Cir. Sept. 6, 2024) (unpublished).

Zherka, however, raises a different challenge; he questions the constitutionality of § 922(g)(1) as applied to him. We have not previously resolved the discrete questions at issue in this as-applied challenge, and we therefore must conduct a *Bruen* analysis of that claim.

---

[9] Bogle had been convicted of categorically violent felonies, including attempted robbery in the second degree and assault in the second degree. *See United States v. Bogle*, 522 F. App'x 15, 19–20 (2d Cir. 2013).

**III.** *Bruen* **Step One: Felons Are Part of "the People."**

We begin our *Bruen* analysis with the first step: does the plain text cover Appellant's conduct? It clearly does. We construe Zherka's complaint as asserting his desire to possess firearms only in a manner that the Second Amendment protects.[10] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. And the Second and Fourteenth Amendments protect an individual's right to "possess a handgun in the home for self-defense" and "carry handguns publicly for [] self-defense." *Bruen*, 597 U.S. at 8–10. Section 922(g)(1), however, prohibits convicted felons from "possess[ing] in or affecting commerce, any firearm or ammunition," including for self-defense inside and outside the home. 18 U.S.C. § 922(g)(1).

Because Section 922(g)(1) clearly covers conduct that the Second Amendment presumptively protects, the only remaining question is whether Zherka, as a nonviolent felon, is included among "the people" protected by the Second Amendment. U.S. CONST. amend II. The government argues that Zherka is

---

[10] Zherka asserts that Section 922(g)(1) permanently prohibits him from possessing firearms even though "he is entitled to exercise his right to bear arms under the Second Amendment." App'x at 12. He also requests a permanent injunction that would enjoin the government from preventing him from possessing a firearm in his home.

not. It contends that the Supreme Court has consistently "defined the right to bear arms as limited to 'law-abiding, responsible citizens.'" Appellee's Br. 10, quoting *Heller*, 554 U.S. at 635; *see also Bruen*, 597 U.S. at 31–32 ("It is undisputed that petitioners . . . —two ordinary, law-abiding, adult citizens—are part of the people whom the Second Amendment protects.") (internal quotation marks omitted). The government also asserts that the Court's repeated assurance that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," *Heller*, 554 U.S. at 626–27, 627 n.26, further suggests that felons as a class are not among "the people" that the Second Amendment protects.

The government's arguments are unavailing for several reasons. First, the argument that the Supreme Court has limited the Second Amendment right to "law-abiding, responsible citizens," *id.* at 635, does not definitively place law breakers, or even felons, outside the protection of the Constitution. "Though the Supreme Court has suggested that law-abiding, responsible, and/or ordinary individuals are protected by the Second Amendment, it is far from clear whether the negative of those adjectives describe[s] individuals who stand *outside* the Second Amendment or instead those who may be disarmed *consistent with* that Amendment." *Antonyuk*, 120 F.4th at 981–82 (emphasis in original) (internal quotation marks omitted). Further,

17

the Supreme Court's assurance that longstanding prohibitions on the possession of

firearms by felons are lawful does not suggest that felons are not part of "the

people" protected by the Second Amendment. That assurance instead suggests that

although felons, like other Americans, are presumptively protected by the Second

Amendment, Congress nevertheless has the authority to disarm them. As Justice

Barrett explained when she was a judge on the Seventh Circuit

> [t]here are competing ways of approaching the constitutionality of gun
> dispossession laws. Some maintain that there are certain groups of
> people—for example, violent felons—who fall entirely outside the
> Second Amendment's scope. Others maintain that all people have the
> right to keep and bear arms but that history and tradition support
> Congress's power to strip certain groups of that right.

*Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting) (internal

citation omitted). For the reasons that then-Judge Barrett articulated, we agree that

the latter is the better way to approach the question. *Id*. at 451–53.

   Moreover, a decision that Zherka does not belong to "the people" and

therefore does not have Second Amendment rights would be at odds with *Heller*.

The Court in that case defined "the people" broadly to include "*all* Americans."

*Heller*, 554 U.S. at 581 (emphasis added). It elaborated that "the people," as referred

to throughout the Constitution, "unambiguously refers to all members of the

political community, not an unspecified subset." *Id*. at 580. The government does not

18

assert that Zherka is not an American nor that he does not, as a felon who has completed his sentence, belong to the political community.

Finally, other constitutional provisions grant rights to "the people" including, for example, the right to "peaceably [] assemble, and to petition the Government for a redress of grievances," U.S. CONST. amend. I, and the right to be free of "unreasonable searches and seizures," *id.* amend. IV. Excluding felons from "the people" for purposes of the Second Amendment would be inconsistent with our understanding of the scope of other constitutional rights because "even felons . . . may invoke the protections of [the First and Fourth Amendments]." *Heller,* 554 U.S. at 644 (Stevens, J., dissenting). The Supreme Court's broad definition of "the people" in *Heller,* moreover, betrays no intent to carve certain classes from "the people" only in the context of the Second Amendment. *See id.* at 580–81. We will neither jeopardize the scope of other rights nor demean the status of Second Amendment rights by narrowly circumscribing the classes of Americans to whom those rights belong. Accordingly, we conclude that Zherka, notwithstanding his felony conviction, is among "the people" protected by the Second Amendment.[11]

---

[11] For examples of other circuit courts concluding the same, see, for example, *Duarte,* 2025 WL 1352411, at *8 (concluding that the defendant's "status as a felon does not remove him from the ambit of the Second Amendment; he is one of 'the people' who enjoys Second Amendment rights"); *Range v. Att'y Gen. United States,* 124 F.4th 218, 222 (3d Cir. 2024) (en

19

IV.    *Bruen* **Step Two: The Historical Tradition of Firearm Regulation in the United States Supports the Constitutionality of Section 922(g)(1).**

Because the Second Amendment protects Zherka and his proposed conduct, we must now determine whether Congress can constitutionally disarm him. "[T]he Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 693. Zherka asserts, however, that *Rahimi* does not apply to him because unlike in that case, there has been no finding that he poses a credible threat to the physical safety of others and because his commission of a nonviolent financial felony is an insufficient proxy for his dangerousness. We agree that, while the analysis in *Rahimi* is relevant in several ways to the present case, it does not directly control it. The operative question, therefore, is whether the government has justified Section 922(g)(1)'s application to Zherka by demonstrating that disarmament of nonviolent felons, *as a class or*

---

banc) (concluding that the appellant, "despite his false statement [felony] conviction, [] remains among the people protected by the Second Amendment" (internal quotation marks omitted)); *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) (concluding that the appellant felon was "a member of the people claiming the right to possess a gun" (internal quotation marks omitted)); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024) (explaining that American citizens with felony convictions are "both persons and citizens, and thus, must also be included in the people" protected by the Second Amendment (alterations adopted and internal quotation marks omitted)); see also *Kanter*, 919 F.3d at 451–52 (Barrett, J., dissenting) (maintaining that "all people have the right to keep and bear arms [including violent felons] but that history and tradition support Congress's power to strip certain groups of that right").

*category of persons*, is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. We conclude that it has.

We start with a discussion of modern felon-in-possession laws. Congress passed the first felon-in-possession law in the early twentieth century. The modern statutes are too temporally distant from 1791 to provide much insight into the original meaning of the Second Amendment. *See Antonyuk*, 120 F.4th at 973 ("[T]he farther we depart from [1791], the greater the chance we stray from the original meaning of the constitutional text."). Such laws, however, are relevant to the *Bruen* step two analysis. To the extent that the felon-in-possession laws were designed to address "unprecedented societal concerns," the Supreme Court instructs that we apply "a more nuanced approach" to assessing relevant historical analogues. *Bruen*, 597 U.S. at 27.

After analyzing modern felon-in-possession laws, we turn to a discussion of the historical tradition of disarmament laws in this country. There are no twins of the modern felon-in-possession laws from the pre-Founding and Founding periods.[12] That the relevant historical record lacks a historical twin is unsurprising,

---

[12] As we have noted above, the absence of a twin in the historical record is not fatal to the government's case. *See Rahimi*, 602 U.S. at 692 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"), quoting *Bruen*, 597 U.S. at 30.

because before and during the Founding periods, felons were typically subject to execution. We discuss below what that fact suggests about the Founders' perceptions of felons' right to bear arms.

Shortly after the Founding, attitudes about appropriate punishment for felons began to change. Evidence in the historical record from that time, including the debates over the ratification of the Constitution, reflects that some Founders believed that felons could be disarmed constitutionally. Although the ratification debates are not specific historical legislative analogues to modern felon in possession laws, we discuss them next because they inform the background tradition of constitutional gun regulation in this country.

Finally, we turn directly to the historical analogues, which establish that there is a tradition of regulating firearms in a manner that is analogous to Section 922(g)(1). Like Section 922(g)(1), laws from seventeenth century England, the American Colonies,[13] and the early United States,[14] establish that it has long been

---

[13] Both English and American colonial history are relevant to our analysis. *See Bruen*, 597 U.S. at 20 (explaining that because the Second Amendment "codified a pre-existing right. . . . English history dating from the late 1600s, along with American colonial views leading up to the founding" are relevant considerations (emphasis omitted)).

[14] The "time periods in close proximity to 1791," are "relevant to our analysis." *Antonyuk*, 120 F.4th at 973. "[S]ources from the time periods close around [that] date[] illuminate the understanding of those steeped in the contemporary understanding of a constitutional provision." *Id.* (alteration adopted) (internal quotation marks omitted). The Supreme Court

22

permissible to regulate firearms possession through legislative proscription on a class-wide basis, without a particularized finding that the individuals disarmed pose a threat to society.

### A. Section 922(g)(1)

Although the Supreme Court characterized laws prohibiting felons from possessing firearms as "longstanding," *Heller*, 554 U.S. at 626, they are, in fact, relatively recent creations, at least in relation to the period immediately surrounding the adoption of the Bill of Rights. Congress first prohibited felons from obtaining firearms in the Federal Firearms Act of 1938 ("FFA"), the predecessor to Section 922(g)(1). FFA, ch. 850, § 2(f), 52 Stat. 1250, 1251 (1938). That statute differed from Section 922(g)(1) in that it criminalized receipt of guns in interstate commerce only for felons convicted of a "crime of violence," which did not include crimes similar to the one that Zherka committed. *Id.* §§ 1(6), 2(f). About

---

has, however, left open the relevance of Reconstruction to the constitutionality of state regulations affecting firearms. *See Rahimi*, 602 U.S. at 692 n.1 (declining to resolve the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)") (internal quotation marks omitted). In *Antonyuk*, we decided that Reconstruction *was* relevant to *state* regulations. 120 F.4th at 973–74. We need not decide whether historical traditions post-dating 1791 are relevant to the Amendment's restrictions on Congress because we conclude that the tradition as of that date validates Section 922(g) as applied here.

two decades later, in 1961, Congress amended the law to prohibit felons from

receiving guns traveling in interstate commerce regardless of their underlying

crime by replacing the term "crime of violence" with "crime punishable by

imprisonment for a term exceeding one year." An Act to Strengthen the Federal

Firearms Act, Pub. L. No. 87-342, 75 Stat. 757, 757 (1961). And finally, in 1968

Congress passed the Gun Control Act, which is currently codified as 18 U.S.C. §

922(g). Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.

Those laws alone may not be sufficient to establish a historical tradition of

firearms regulation, but the modern concerns that they addressed, and continue to

address, diminish the government's burden of drawing a tight historical analogy to

Section 922(g)(1). The Supreme Court has admonished that the "Founders created a

Constitution – and a Second Amendment – 'intended to endure for ages to come,

and consequently, to be adapted to the various crises of human affairs.'" *Bruen*, 597

U.S. at 27–28, quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). In

line with the Court's precedent, we have similarly acknowledged that "'[a] more

nuanced approach' [to analogizing to history] will often be necessary in . . . cases

concerning 'new circumstances' or 'modern regulations that were unimaginable at

the founding,' such as regulations addressing 'unprecedented societal concerns or

24

dramatic technological changes.'" *Antonyuk*, 120 F.4th at 970 (alterations adopted), quoting *Bruen*, 597 U.S. at 27–28. We turn, therefore, to the concerns animating Section 922(g)(1) and its precursors.

Although gun violence is hardly a new social concern,[15] Congress passed both the FFA and the Gun Control Act to address the unprecedented scale of gun violence in the years around their adoption. It passed the FFA in response to rising gang violence that grew from Prohibition.[16] And, the Supreme Court has concluded, it passed the Gun Control Act "in response to the precipitous rise in political assassinations, riots, and other violent crimes involving firearms, that occurred in this country in the 1960's." *Lewis v. United States*, 445 U.S. 55, 63 (1980).

---

[15] *See, e.g.*, Saul Cornell, *The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History*, 17 STAN. L. & POL'Y REV. 567, 578 (2006) (explaining that "[a] profound change occurred in American gun culture in the early decades of the [nineteenth] century: the supply and demand for hand guns increased dramatically," which prompted "new social problems"); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 63, 65 (2017) (explaining that gun carry restriction laws proliferated in the 1800s "as interpersonal violence and gun carrying spread" and that after the Civil War the South "witnessed violence at rates greater than the rest of the country," and therefore "turned in part to stronger gun laws as a remedy").

[16] *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, & THE FUTURE OF HELLER 43–45 (2018); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 701 (2009) (explaining that efforts at firearms regulation after World War I were "fed by . . . growing crime after Prohibition began in 1920").

The problem of gun violence persists today at an unprecedented scale. In 2020, the number of gun-related deaths in the United States reached the highest level ever recorded up to that point, and the rate has remained high ever since.[17] Over half of adults surveyed in the United States "report that either they, or a family member, have experienced a firearm-related incident."[18] And for children and adolescents in the United States, "firearm-related injury has been the leading cause of death [since 2020], . . . surpassing motor vehicle crashes, cancer, and drug overdose and poisoning."[19] That evolving public health crisis necessitates that we take the "more nuanced approach" that *Bruen* set forth for assessing historical analogies to Section 922(g)(1).

That approach is plainly illustrated in *Rahimi*. There, the Supreme Court

---

[17] *See* Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.*, JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH 4 (Apr. 28, 2022); Center for Gun Violence Solutions, *U.S. Gun Violence in 2021: An Accounting of a Public Health Crisis*, JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH 4 (June 2023); Center for Gun Violence Solutions, *Gun Violence in the United States 2022: Examining the Burden Among Children and Teens*, JOHN HOPKINS BLOOMBERG SCH. OF PUB. HEALTH 3 (Sept. 2024); *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data*, JOHNS HOPKINS BLOOMBERG SCH. PUB. HEALTH (Sept. 12, 2024), https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

[18] *See The United States Surgeon General's Advisory on Firearm Violence: A Public Health Crisis in America*, OFFICE U.S. SURGEON GEN. 5 (2024).

[19] *Id.* at 3.

upheld a further expansion of the firearms limitations contained in 18 U.S.C. § 922.

*Rahimi*, 602 U.S. at 693. That case involved a prohibition on possession of firearms

by persons under a protective order occasioned by incidents of (not necessarily

gun-related) domestic violence. *Id.* at 684–86; *see also* 18 U.S.C. § 922(g)(8). That

prohibition was adopted several decades later than the FFA, in the Violence

Against Women Act of 1994.[20]

As the Supreme Court acknowledged, no precise historical precedent for

such a criminal prohibition existed. *See Rahimi*, 602 U.S. at 698, 700–01. The statute

was a novel response to the problem of domestic violence, primarily against

women and children, that had not been the direct object of governmental concern

or of firearms regulation until the late 20th century. Nevertheless, the Court upheld

that law, analogizing to pre-Bill of Rights laws that regulated gun possession by

individuals and groups identified as dangerous to the community in general

and/or to particular individuals. *Id.* at 693–700. We look to similar aspects of that

tradition here.

---

[20] *See* Cary Franklin, *History and Tradition's Equality Problem*, 133 YALE L.J. F. 946, 957 (2024)
(discussing the legislative history of Section 922(g)(8)).

B. *Historical punishments for felonies*

There are no historical twins for Section 922(g)(1) from the colonial era.[21] The absence in the historical record of a dead ringer for felon-in-possession laws does not, however, support that Section 922(g)(1) is unconstitutional as applied to Zherka; rather, it is largely attributable to how the English and early Americans punished felons. Between the seventeenth and nineteenth centuries, legislatures imposed the death penalty and total estate forfeiture as punishments for the commission of felonies.

In feudal England, the term "felony" referred to "a breach of the feudal obligations between lord and vassal," the consequence of which was "forfeiture of goods and the escheat of the fief." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 463 (2009). As

_____

[21] We are, however, aware of at least two examples in the historical record in which disarmament was a punishment for lesser offenses. An English statute from the early seventeenth century disarmed "Popish recusants, convicted in a court of law of not attending the service of the church of England." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 55 (London, A. Strahan 1825); An Act to Prevent & Avoid Dangers which May Grow by Popish Recusant, 3 Jac. 1, c. 5, § 16 (1605) (Eng.). And in 1624, a Virginia adjudicative body disarmed an individual who engaged in "base" and "opprobrious" speech. David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 AM. J. LEGAL HIST. 354, 371 (1982). These two examples are insufficient by themselves to establish a tradition of firearms regulation analogous to Section 922(g)(1), but their existence suggests that the English and early Americans were not entirely opposed to laws disarming felons.

the feudal order passed, felony later came to mean a "serious crime punishable by death." *Id.* at 464.[22] Indeed, William Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 95 (London, A. Strahan 1825).

Although the traditional common-law felonies included murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny,[23] the category of offenses classified as felonies, and therefore punishable by death, included some nonviolent crimes. By the eighteenth century, the list of felonies had expanded to encompass some 160 crimes, including "counterfeiting currency, embezzlement, and desertion from the army." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).[24] Thus, while the list of felonies under the modern definition has grown to encompass all crimes punishable by more than a year in prison, the

---

[22] *See also* Blackstone, *supra* note 21, at 97 ("The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them.").

[23] Tress, *Unintended Collateral Consequences*, 57 CLEV. ST. L. REV. at 464.

[24] *See* Blackstone, *supra* note 21, at 18; *see also* Francis Bacon, *Preparation Toward the Union of Laws of England and Scotland*, *in* 2 THE WORKS OF FRANCIS BACON 163–64 (Basil Montagu ed., Cary & Hart 1844) (listing the nonviolent crimes of unlawful hunting and repeated forgery as felonies punishable by death).

Founding-era concept was not limited to violent crimes. Rather, it included some "white collar" crimes[25] —like Zherka's — and many other offenses that today are punished neither by death nor even extremely long prison sentences, and even some conduct, such as consensual same-sex relations, that may not constitutionally be criminalized at all.[26] Like the English, the American colonists employed that concept of felony in their burgeoning legal systems and imposed the death penalty for a number of nonviolent crimes.[27] In fact, the death penalty as punishment for felonies remained ubiquitous in America during the Founding era and until the nineteenth century.[28]

We conclude from this history that the lack of historical laws prohibiting felons from possessing firearms is not dispositive of Section 922(g)(1)'s constitutionality. "[T]he absence of a distinctly similar historical regulation . . . can

---

[25] That term is generally understood not to have entered common use until Edwin Sutherland's Presidential Address to the American Sociological Society, *White-Collar Criminality*, 5 AM. SOCIO. REV. 1 (1940), and his later textbook, WHITE COLLAR CRIME (1949).
[26] *See Criminalization of Homosexuality in American History*, DEATH PENALTY INFORMATION CENTER, https://deathpenaltyinfo.org/policy-issues/biases-and-vulnerabilities/lgbtq-people/criminalization-of-homosexuality-in-american-history [https://perma.cc/GMZ2-6ZBK] (last visited May 6, 2025).
[27] *See* STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 18, 23–24 (2002) (describing instances in which men sentenced to death for committing forgery and horse theft in Georgia during the late eighteenth and early nineteenth centuries attempted to escape jail).
[28] *Id.*

only prove so much," *Antonyuk*, 120 F.4th at 969, and here it proves next to nothing. Although felons and firearms existed at the Founding, the Founders had no occasion to consider whether the collateral consequences of a felony conviction should include disarmament since, as previously discussed, the standard punishment for a felony was death and the forfeiture of all property. The collateral consequences of a felony conviction that we now recognize, including the loss of civil rights and the prohibition of firearm possession, are the results of the nineteenth century criminal reform efforts to reduce the use of the death penalty and the growth of the federal government during the twentieth century.[29] Accordingly, the lack of felon-in-possession laws at the time of the Founding is not probative of the Founders' perception of the scope of the Second Amendment right.

We further note that several of our sister circuits have concluded that the Founders likely would have considered disarmament permissible as punishment for a felony conviction since they passed laws instituting the death penalty and forfeiture of a perpetrator's entire estate as punishments for both nonviolent and violent felonies. *See United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024)

---

[29] *See* BLOCHER & MILLER, *supra* note 16, at 43–47 (explaining that the federal government's involvement in gun regulation in the 1930s was in part a reflection of the "general growth in the scope and power of the federal government").

(explaining that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property" and collecting examples); *Hunt*, 123 F.4th at 706 (same). The logic is that the greater punishment of death and estate forfeiture includes the lesser punishment of disarmament.

The Supreme Court, too, has embraced the greater-includes-the-lesser logic in the Second Amendment context when it concluded that "the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is [] permissible" because a historical analogue to that law imposed the greater punishment of imprisonment. *Rahimi*, 602 U.S. at 699. We are reluctant to place much weight on this argument, however. That felons could be executed when the Bill of Rights was enacted does not mean that anyone convicted of a felony today forfeits all civil rights. *See Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting) ("[W]e wouldn't [necessarily] say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding."). Indeed, the Supreme Court in *Rahimi* made no such extreme claims. Instead, it pointed out that specific early weapons regulations (the "going armed" laws) imposed more severe penalties than the disarmament statutes at issue in that case. 602 U.S. at 699. It made no blanket

32

reliance on eighteenth century capital punishment practice to validate any lesser deprivation later imposed on felons.

Ultimately, the severe punishment of felons, including those who committed nonviolent crimes, in colonial times provides at least some reason to be skeptical that the drafters of the Second Amendment intended to prohibit Congress from disarming felons who were spared execution, but we do not consider it conclusive.

C. *Debates over Ratification of the Constitution*

Although the death penalty was the primary punishment for felonies during the Founding generation, various efforts at penal reform mobilized in states across the nation during the late 18th and early 19th centuries. Those efforts often resulted in the passage of laws that imposed imprisonment for crimes that had formerly been capital crimes. Tress, *Unintended Collateral Consequences*, 57 CLEV. ST. L. REV. at 468– 70. "Within two decades of gaining independence from England, the states of the Union had replaced execution with incarceration as the punishment for all but a few crimes." *Id.* at 468.

Debates over the right to bear arms in state ratification conventions that occurred at around the same time as efforts at penal reform reflect the evolving attitudes about the treatment of felons. Those debates also support a historical

33

tradition of firearms regulation through legislative disarmament and illustrate some

Founders' views of the scope of the Second Amendment right.

The right to bear arms proposals most often cited to support Congress's

authority to disarm felons include: the New Hampshire Proposal, Samuel Adams's

proposal to the Massachusetts convention, and the Pennsylvania Dissent of the

Minority ("the Dissent"). *See Kanter*, 919 F.3d at 454–55 (7th Cir. 2019) (Barrett, J.,

dissenting).[30] We focus principally on the Dissent, which most clearly supports the

view that some Founders believed that it was permissible for Congress to disarm

convicted felons.[31]

The Dissent provides that "the people have a right to bear arms for the

defence of themselves and their own State or the United States, or for the purpose of

---

[30] The New Hampshire proposal prohibited Congress from "disarm[ing] any citizen, unless such as are or have been in actual rebellion." 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891). Similarly, Samual Adams's proposal to the Massachusetts convention forbade Congress from "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms." *See* 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675, 681 (1971).

[31] The Dissent is not a minority view expressing a dissent from a majority committed to a broader view of the right to bear arms; rather, it was a dissent from the majority's vote to ratify the original Constitution. *See* 2 SCHWARTZ, *supra* note 30 at 627–28. The Antifederalists authored the Dissent in objection to the Constitution's "lack of a Bill of Rights." *Id.* at 627. Although the dissenters failed to persuade the majority of the convention to reject ratification, their main objections were ultimately vindicated by the adoption of the Bill of Rights four years later. *Id.* at 628.

killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971). On its face, the last proviso of the Dissent clearly permits disarmament of individuals who commit crimes.[32]

The Dissent was also "highly influential" in the debates that led to the Bill of Rights, *Heller*, 554 U.S. at 604, and was among the most "widely distributed of any essays published during ratification," Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENT. 221, 227 (1999). It is therefore illustrative of what at least some Founders believed should be Congress's authority to disarm

---

[32] We note that others have proposed an interpretation of the Dissent that would not necessarily support felon disarmament laws; under that view, the catchall phrase "or real danger of public injury from individuals," modifies the type of crimes that would constitutionally authorize Congressional disarmament. *See Kanter*, 919 F.3d at 456 (Barret, J., dissenting) (stating that the phrase "or real danger of public injury from individuals" suggests that only individuals who have committed "the subset of crimes suggesting a proclivity for violence" could be disarmed). We are not persuaded by this strained, alternative reading of the Dissent. The Dissent clearly proposes permitting disarmament in the disjunctive, for either "crimes committed *or* real danger of public injury." 2 SCHWARTZ, *supra* note 30 at 665 (emphasis added). Nothing in the text of the dissent suggests that we should read "or" other than how it is usually employed – to present two alternative bases for permissible firearm restrictions.

individuals who committed crimes and, as a result, informs the historical tradition of gun regulation in the United States. Nevertheless, the proposal that entered the Constitution as the Second Amendment did not contain the proviso permitting firearms restrictions on criminals, and so the Dissent too, while reflecting at least some ambivalence about the scope of the Amendment, is inconclusive.

   D. *English, American Colonial, and Early American Status-Based Disarmament Laws*

The absence, for understandable reasons, of an eighteenth century "historical twin" for contemporary felon in possession laws has not prevented the Supreme Court, or this Court, from recognizing "what common sense suggests," *Rahimi*, 602 U.S. at 692, 698, that persons who present a clear danger to others if permitted to possess firearms may be disarmed. *See also Antonyuk*, 120 F.4th at 983–84. It is presumably for that reason that, as noted above, the Supreme Court has consistently disavowed the notion that its rejection of state and federal laws prohibiting ownership and carrying of guns by law-abiding members of the community calls into question the general constitutionality of laws disarming felons. *See Heller*, 554 U.S. at 626–27, 627 n.26; *McDonald*, 561 U.S. at 786. Indeed, the Supreme Court and

36

this Court have affirmed that dangerous people can be disarmed.[33] As also noted above, that commonsense conclusion easily supports the facial validity of Section 922(g)(1), because it can hardly be assumed that the Framers contemplated an unqualified right on the part of persons convicted of violent crimes to carry guns.

Zherka argues, however, that his case differs from those precedents. *Antonyuk* addressed a licensing regime in which the question was whether an applicant for a permit was, individually, a person whose conduct had shown him to be too dangerous to be trusted to use a firearm in a lawful and prudent manner. And while *Rahimi*, like this case, addressed a criminal statute prohibiting firearms possession by a category of persons, the category in question included only individuals whom a court had specifically found to be dangerous to one or more other persons. Most of the historical analogues that the Supreme Court identified in *Rahimi* similarly involved firearms restraints imposed on specific individuals. 602 U.S. at 695–700.

---

[33] *See Rahimi*, 602 U.S. at 684–86, 690 (holding that persons subject to domestic-violence restraining orders based on a finding of dangerousness can be prohibited, on pain of criminal penalties, from possessing firearms); *Bruen*, 597 U.S. at 13 n.1, 38 n.9 (contrasting New York's unconstitutional "may issue" firearm licensing regime with state licensing regimes that denied firearms licenses to "individuals whose conduct has shown them to be lacking the essential character o[r] temperament necessary to be entrusted with a weapon," which the Court confirmed were constitutional), quoting Conn. Gen. Stat. § 29–28(b); *Antonyuk*, 120 F.4th at 994–99 (upholding New York's "character" requirement which requires firearms licensing officials to assess an applicant's "potential dangerousness").

In contrast, Section 922(g)(1) prohibits firearms possession by a broad category of persons whose conduct violated a wide range of criminal statutes. Zherka argues both that the statute is unconstitutional as applied to persons convicted, as was he, of a nonviolent felony, and that, in any event, he should be entitled to some kind of individualized process to decide whether he himself presents the kind of danger referenced in *Rahimi* and *Antonyuk*. The historical inquiry for us, therefore, is whether our tradition encompasses not only laws permitting disarmament of particular individuals on a case-by-case basis, but also laws disarming broad classes of people.

The answer is unequivocally yes. English, American colonial, and early American histories abound with examples of laws demonstrating that legislatures had broad authority to regulate firearms, including by disarming large classes of people based on their status alone. Religious minorities, political dissenters, Native Americans, and persons of color were among the disfavored groups that historical legislatures disarmed based on a perception that persons in those categories were inherently dangerous or non-law-abiding. Many of those laws are offensive to contemporary moral sensitivities, or might well be deemed unconstitutional today on First and Fourteenth Amendment grounds. They are, however, relevant to the

38

Second Amendment historical analysis that *Bruen* requires we conduct. As we discuss in greater detail below, the status-based disarmament laws show that at the time of the adoption of the Second Amendment, legislatures had the authority to use status as a basis for disarmament. Moreover, those laws demonstrate that legislative disarmament did not always turn on a particularized finding of a propensity for violence. Instead, legislatures could disarm classes of people that they perceived as dangerous, without any judicial scrutiny of the empirical basis for that perception.

We start with English history. The 1689 English Bill of Rights, enacted by Parliament and considered the "predecessor to our Second Amendment," *Bruen*, 597 U.S. at 44 (internal quotations marks omitted), guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and *as allowed by law*," 1 W. & M., Sess. 2, ch. 2, § 7 (1689), *in* 3 ENG. STAT. AT LARGE 441 (London, Mark Baskett, Henry Woodfall, & William Strahan 1763) (emphasis added). On its face, that statute supports the proposition that Parliament could limit the right of Protestants to bear arms "by law" and that non-Protestants had no right to bear arms at all. *Id.* In fact, Parliament explicitly forbade Catholics from owning firearms unless a justice of the peace gave them permission to do so.[34]

---

[34] *See* An Act for the Better Securing the Government by Disarming Papists and Reputed

Legislatures in the American colonies also disarmed Catholics, largely in response to the French and Indian War, which many perceived as a religious war between Protestants and Catholics.[35] For example, in Virginia in 1756, Catholics and suspected Catholics could not possess arms unless they took an oath authorized by Parliament.[36] Likewise in Pennsylvania, the legislature required colonial officials to take firearms from any "papist or reputed papist."[37] The legislature of Maryland—a state founded by and for Catholics[38]— did similarly.[39]

In another example of religious status-based disarmament, the Massachusetts Bay Colony, during the late 1630s, disarmed at least 58 individuals who were

---

Papists, 1 W & M., Sess. 1, ch. XV, § 3 (1688), *in* 6 THE STATUTES OF THE REALM 71–72 (London, Dawsons of Pall Mall 1963).

[35] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020).

[36] *See* An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, ch. IV, §§ I–III (1756), *in* 7 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35–36 (William Waller Henin ed., Richmond, Franklin Press 1820) ("1756 Virginia Act").

[37] An Act for Forming and Regulating the Militia of the Province of Pennsylvania, § VI, pt. 2 (1759) ("1759 Pennsylvania Act"), *in* THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 609, 627 (James T. Mitchell & Henry Flanders eds., WM Stanley Ray 1898).

[38] *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARVARD L. REV. 1409, 1424 (1990) ("Maryland . . . was founded . . . to provide a place for English Catholics to escape the persecution they suffered in the mother country.")

[39] *See* An Act for Regulating the Militia of the Province of Maryland (1756), *in* 52 ARCHIVES OF MARYLAND 450, 454 (J. Hall Pleasants ed., 1935); *see also* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 46 (2024) ("[I]t appears that the governor [of Maryland] never signed the bill.").

accused of following the religious views preached by Anne Hutchinson. *See Range v. Att'y Gen. United States*, 69 F.4th 96, 122–23 (3d Cir. 2023) (Krause, J., dissenting), *cert. granted, judgment vacated sub nom Garland v. Range*, --- U.S. ---, 144 S. Ct. 2706 (2024).[40] Anne Hutchinson was a Boston preacher who challenged religious orthodoxy in the Massachusetts Bay Colony by advocating for "direct, personal relationships with the divine." *Id.* Governor John Winthrop found those views threatening and accused Hutchinson and her followers of "being Antinomians— those who viewed their salvation as exempting them from the law." *Id.* at 123. He banished Hutchinson and, to "embarrass" her followers, forced them to personally deliver their firearms to the authorities. *Id.*, quoting James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 NEW. ENG. Q. 381, 391 (1988).

In addition to Catholics and members of minority Protestant sects, American legislatures during the Revolutionary War passed laws disarming individuals that

---

[40] After the Supreme Court remanded the *Range* decision for reconsideration in light of *Rahimi*, the Third Circuit issued a materially identical opinion to the one that it issued before the Supreme Court's vacatur and remand. *Range*, 124 F.4th 218. On remand and in light of *Rahimi*, Judge Krause agreed with the majority's decision that Section 922(g)(1) was unconstitutional as applied to the appellant in that case. She filed a concurring opinion explaining that her reasoning differed from the majority's but that she was no longer dissenting. *Id.* at 250–85 (Krause, J., concurring). The history that Judge Krause cited to support her initial dissenting opinion still persuasively supports our conclusion, despite her change of position.

they perceived as dangerous to the revolutionary cause. In an early example, the Connecticut Colony General Assembly passed a law in 1775 that disarmed any person convicted of "libel[ing] or defam[ing] any of the resolves of the Honorable Congress of the United Colonies, or the acts and proceedings of the General Assembly of this Colony."[41] In a letter to the Governor of Rhode Island, George Washington discussed that Connecticut law and remarked that "the other Colonies ought to adopt similar ones."[42] Shortly thereafter in March 1776, the Continental Congress passed a resolution recommending that assemblies in the colonies "cause all persons to be disarmed . . . who are notoriously disaffected to the cause of America."[43] Several colonies heeded that recommendation and passed their own laws disarming the disloyal.[44]

      Legislative bans on firearm possession in the American colonies were not

---

[41] An Act for the Restraining and Punishing Persons Who are Inimical to the Liberties of this and the Rest of the United Colonies, and for Directing Proceedings Therein § 527 *in* THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT FROM MAY, 1775 TO JUNE, 1776, at 193 (Hartford, The Case, Lockwood & Brainard Co. 1890).

[42] Letter from George Washington to Nicholas Cooke (Jan. 6, 1776), NATIONAL ARCHIVES, https://founders.archives.gov/documents/Washington/03-03-02-0025 [https://perma.cc/R9J3-XX6Y] (last visited May 20, 2025).

[43] *See* 4 *Journals of the Continental Congress*, 1774-1789, at 205 (Worthington Chauncey Ford ed., Washington, 1906).

[44] *See Jackson*, 110 F.4th at 1126–27 (listing laws from the colonies of Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey that "prohibited possession of firearms by people who refused to declare an oath of loyalty").

limited to religious minorities and political dissenters. Laws in various colonies also prohibited Native Americans, people of African descent, and mixed-race people from owning firearms.[45] Virginia, for example, passed a law in 1723 that prohibited Black people, mixed-race people, and Native Americans from "keep[ing], or carry[ing] any gun, powder, shot, or any club, or other weapon whatsoever, offensive or defensive."[46] The law allowed those classes of people to possess guns only if they were "house-keeper[s]," "listed in the militia," or if they lived on a "frontier plantation" and obtained a license to possess from a "justice of the peace"

---

[45] *See, e.g.*, An Act for Regulating the Indian Trade and Making it Safe to the Publick, No. 269, § IV (1707), *in* 2 THE STATUTES AT LARGE OF SOUTH CAROLINA 310 (Thomas Cooper, ed., Columbia, A.S. Johnston, 1837) (prohibiting the sale of firearms to Native Americans on penalty of death); *Williams*, 113 F.4th at 652–53 (describing colonial laws from Virginia and New Netherland that prohibited citizens from providing arms to Native Americans on penalty of death); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HISTORY REV. 139, 148 (2007) (describing a North Carolina 1741 slave code that prohibited slaves from possessing firearms). Even if racial minorities would not have been considered full-fledged members of the political community as it then existed, those laws remain relevant to the *Bruen* inquiry because, as explored in greater detail below, they are relevantly similar to Section 922(g)(1). *See infra* pp. 46–49. Nevertheless, as previously explained, legislatures in the colonies and states repeatedly disarmed groups of fully fledged members of the political community — free, Christian, white men. *See supra* pp. 39–42.

[46] An Act Directing the Trial of Slaves, Committing Capital Crimes; and for the More Effectual Punishing Conspiracies and Insurrections of Them; and for the Better Government of Negros, Mulattos, and Indians, Bond or Free ("1723 Virginia Act"), ch. IV, § XIV (1723), *in* 4 THE STATUTES AT LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, 131 (Richmond, R.W. & G. Bartow 1823).

in their county.[47]

Class-wide, race-based legislative disarmament continued in the United States after the American Revolution and often took the form of "complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race."[48] In Mississippi, for example, slaves were prohibited from keeping or carrying guns unless a justice of the peace granted a license upon application *of the slaveholder*.[49] By 1852, however, Black people in Mississippi were prohibited from owning guns with no exceptions; the Mississippi legislature passed a law that prohibited magistrates in the state from issuing licenses to carry and use firearms to any Black person.[50]

---

[47] *Id.* § XV.

[48] *See* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. REV. 1551, 1562 (2009), citing Saul Cornell, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 28-29 (2006).

[49] An Act Respecting Slaves, ch. XVII, § 4 (1805), *in* THE STATUTES OF THE MISSISSIPPI TERRITORY 379 (Harry Toulmin ed., Natchez, Samuel Terrell 1807).

[50] *See* An Act to Prohibit Magistrates from Issuing License to Negroes to Carry and Use Firearms, 1852 Miss. Laws 328, ch. 206, § 1. For other examples of race-based restrictions on gun possession, *see, e.g.,* 1806 Md. Laws 298, ch. 81, § II (prohibiting any Black or mixed race person from carrying a gun unless that person was free and had a certificate from a justice of the peace certifying that he was an "orderly and peaceable person"); 8 Del. Laws 208, ch. 176, § 1 (1832) (prohibiting freedmen from possessing firearms unless approved to do so by a justice of the peace); An Act Concerning Slaves § 6 (1840), *in* 2 LAWS OF TEX. 1822–1897, 345–46 (H.P.N. Gammel ed., Austin, The Gammel Book Co. 1898) (prohibiting slaves from using firearms without permission of the slave's owner); An Act to Amend an Act Entitled "An Act Reducing Into One the Several Acts Concerning Slaves, Free

These examples demonstrate that before, during, and shortly after the

Founding, legislative bodies regulated firearms by prohibiting their possession by

categories of persons perceived to be dangerous. And those regulations were

accepted as lawful. We are not aware of challenges to those restrictions under state

and federal constitutional protections of the right to bear arms.

Nor did that tradition disappear after the adoption of the Fourteenth

Amendment guaranteed federal constitutional rights against state governments. In

the latter half of the nineteenth century, various jurisdictions prohibited so-called

"'tramps' — typically defined as males begging for charity outside of their home

county" — from possessing firearms.[51] Those jurisdictions included New

Hampshire and Vermont in 1878, Rhode Island, Ohio, and Massachusetts in 1880,

Wisconsin as early as 1883, and Iowa in 1897.[52] The Ohio Supreme Court,

---

Negroes and Mulattoes, and for Other Purposes," Ch. 187, § 4 (1832), *in* SUPPLEMENT TO
THE REVISED CODE OF THE LAWS OF VIRGINIA 246–47 (Richmond, Samuel Sheperd & Co.
1833) (repealing a law that allowed Black people to possess firearms with a license and
enacting instead a total prohibition on Black people possessing firearms); Of the Laws
Relative to Indians within This State, Tit. V, Ch. 1, § 1 (1847), *in* A MANUAL OR DIGEST OF
THE STATUTE LAW OF THE STATE OF FLORIDA, OF A GENERAL AND PUBLIC CHARACTER 547
(Leslie A. Thompson ed., Boston, Charles C. Little & James Brown 1847) (authorizing
justices of the peace in Florida to confiscate firearms from Native Americans who had
ventured off their reservation).

[51] Greenlee, *Historical Justification*, *supra* note 35 at 270.

[52] *See* 1878 N.H. Laws 612, ch. 270 § 2; 1878 Vt. Acts & Resolves 30, ch. 14 § 3; 1880 R.I. Acts
& Resolves 110, ch. 806 § 3; Miscellaneous Offenses Against Public Policy, tit. I, ch. 8 §

moreover, upheld the Ohio tramp disarmament law against a state constitutional challenge in *State v. Hogan*, where it explained that the right to bear arms "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." 63 Ohio St. 202, 219 (1900). Importantly, the Ohio law, and all the other "tramp laws," did not narrowly apply only to those who were found to have terrorized others; instead, it applied to any covered person who possessed a firearm, based on the prospective legislative judgment that such persons were dangerous.[53]

The "tramp" laws may be too distant from 1791 to inform us of the Founders' beliefs about the scope of Second Amendment rights. They illustrate, however, that the tradition of legislative disarmament of classes of persons based on a perception of dangerousness has survived generations, even if the laws' targets have shifted. Over time, the categories of persons perceived as dangerous evolved from political

---

6995, *in* 2 The Revised Statutes and Other Acts of a General Nature of the State of Ohio in Force Jan. 1, 1880, 1654 (M.A. Daugherty, John S. Brasee, & George B. Okey eds., Columbus, H.W. Derby & Co. 1879); 1880 Mass. Acts 232, ch. 257 § 4; Of Tramps, tit. 17, ch. 65a., § 4, *in* Supplement to the Revised Statutes of the State of Wisconsin, 1878, 332-33 (A.L. Sanborn & J.R. Berryman eds., Chicago, Callaghan & Co. 1883); Of Vagrants, tit. 25, ch. 5, § 5135 (1897), *in* Annotated Code of the State of Iowa 1981 (Des Moines, F.R. Conway 1897).

[53] *See* Greenlee, *Historical Justification*, *supra* note 35, at 269–70 (describing that the tramp disarmament laws were "enacted for the purpose of promoting public safety by disarming dangerous persons").

and religious dissenters or enslaved or formerly enslaved persons in the eighteenth and early nineteenth centuries, to "tramps" in the latter nineteenth century, to convicted criminals in the twentieth.[54] But the tradition that legislatures could make such judgments, consistent with the Second Amendment "right to bear arms," has persisted.

For most of our history, moreover, such prohibitions met with little or no constitutional resistance. As we have noted above, the tradition is so strongly rooted that even after the Supreme Court, early in this century, reinvigorated the Second Amendment and detached its meaning from its "well-regulated militia" prologue, the Court has consistently assured that its decisions did not threaten "longstanding prohibitions on the possession of firearms," by felons, *Heller*, 554 U.S. at 626, or state licensing regimes that denied firearms to persons whose conduct showed that they were not "law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted).

---

[54] While the first federal prohibition on possession of firearms by persons convicted of violent felonies was passed in 1938, *see* Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938), state statutes forbidding possession of all or certain firearms by felons were already in existence, *see* Act of Mar. 7, 1923, ch. 266 § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 118, § 3, 1923 N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96; Act of Feb. 26, 1925, ch. 260 § 2, 1925 Or. Gen. Laws 468.

There is some disagreement over why legislatures passed those laws. Some argue that legislatures disarmed disfavored groups out of fear that they were presently dangerous to the polity and would incite rebellion if armed; others argue that legislatures were motivated to assert broad disarmament authority by a more generalized fear that members of those groups were not law-abiding or trustworthy.[55] We decline to engage in conjecture about the finer motivations of legislative bodies that sat centuries ago. *See generally South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1262 (4th Cir. 1989) ("Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed."). We leave that task to trained historians.

---

[55] For the debate over the motivating forces behind disarmament of Catholics *compare Range*, 69 F.4th at 121 (Krause, J., dissenting) (arguing that the English prohibition on Catholic armament "was not based on the notion that every single Catholic was dangerous" but was rather based on "the categorical argument English Protestants made . . . that Catholics' faith put the dictates of a 'foreign power,' namely the Vatican, before English law"), citing Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 ETICA & POLITICA 201, 228–29 (2018) *with Williams*, 113 F.4th at 651, 653 (explaining that Parliament disarmed Catholics based on its perception of "what people were dangerous" and that colonial officials did the same because "Protestant settlers feared the Catholics would side with France, a Catholic kingdom" in the French and Indian War), citing Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1, 7–21, 35–46 (2024); *see also Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (explaining that disarmament laws prevented slaves and Native Americans from possessing firearms "as a matter of course" because those groups "were thought to pose more immediate threats to public safety and stability").

It does not matter whether legislatures believed that members of the targeted groups had a specific propensity for violence or were, more broadly, unable to follow the law, because it is at least clear from the historical evidence and from the text of the disarmament laws that legislatures could disarm people as long as they belonged to an identity group that the legislature perceived as dangerous. The status-based disarmament statutes are "relevantly similar" historical analogues, *Bruen*, 597 U.S. at 29 (internal quotation marks omitted), to Section 922(g)(1). Section 922(g)(1), too, operates by class-wide, status-based disarmament, and it disarms felons because Congress perceives them, broadly, as dangerous. *See Barrett v. United States*, 423 U.S. 212, 218 (1976) ("The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."). As history demonstrates, Congress has no constitutional obligation to more rigorously justify its blanket disarmament of convicted felons.

We acknowledge that many of the historical precedents for class-based prohibitions on firearms are, to say the very least, offensive to contemporary morals and rooted in prejudiced stereotypes and racial, religious, or class bigotry. We cite them not as examples to be followed but rather, according to the analysis the

Supreme Court has directed we undertake, as examples of a historical tradition of broad categorical restrictions on firearms possession. The tradition of status-based, categorical restrictions on firearms possession is indicative of an understanding, before, during, and after the period of the Founding and continuing to the present day, of a legislative power, consistent with the Second Amendment, to disarm categories of persons presumed to be dangerous.

We note, however, that while prior discrimination against religious, political, or racial minorities, or the law-abiding poor, would undoubtedly offend other constitutional provisions today, the prohibition of firearms possession by persons convicted of felonies is based neither on immutable characteristics nor innocent impoverishment. Rather, it is based on those persons' prior *conduct*, formally admitted or proven beyond a reasonable doubt, that constitutes a serious violation of the law. Such violations of the social compact indicate a serious disregard for fundamental legal norms. Congress's conclusion that a felony conviction demonstrates a character or temperament inconsistent with the safe and prudent possession of deadly weapons is an appropriate exercise of its longstanding power to disarm dangerous categories of persons.

**V.    Zherka's As-Applied Challenge.**

Despite the historical tradition of legislative disarmament, Zherka argues that Section 922(g)(1) cannot "constitutionally be applied to an individual whose only prior convictions were for nonviolent crimes, because the historical principles underlying the Second Amendment indicate that only individuals who have been shown to be *dangerous* can be disarmed." *See* Appellant's Letter Br., Doc. 172 at 1 (Nov. 15, 2024). Put differently, he contends that Section 922(g)(1)'s disarmament of all felons sweeps too broadly because it does not provide an exception for nonviolent felons.

The Sixth Circuit recently embraced this view in dicta. *See United States v. Williams*, 113 F.4th 637, 659–63 (6th Cir. 2024). It pointed out that some of the categorical disarmament laws vested the discretion to make a finding that someone was too dangerous to possess firearms "in the officials on the ground," not the legislature. *Id.* at 660. It further asserted that even when the "disarmament legislation itself created the exception regime, the fact remained that individuals had the opportunity to demonstrate that they weren't dangerous." *Id.* From that background the Sixth Circuit concluded that "[t]he relevant principle from our tradition of firearms regulation is that, when the legislature disarms on a class-wide

51

basis, individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization." *Id.* at 661. Because no such opportunity exists under Section 922(g)(1), or any related law, the Sixth Circuit suggested that it would likely be unconstitutional as applied to a non-dangerous person convicted of only a nonviolent felony. *Id.* at 661–63.

Zherka's argument and the Sixth Circuit's analysis are flawed for several reasons. First, history does not support the proposition that status-based disarmament laws were permissible *only* if they also provided a mechanism for individuals to prove that they were not too dangerous to own a firearm. Although some of the historical laws created such an exemption structure,[56] not all of them did. Some provided for exceptions unlinked to an individualized dangerousness finding, whereas others provided for no exceptions at all. The 1723 Virginia law prohibiting persons of color from possessing firearms, for example, allowed possession only if those persons were "house-keeper[s]," "listed in the militia," or if they lived on a "frontier plantation" and obtained a license from a justice of the peace.[57] Those exceptions were not based on an individualized assessment of

---

[56] *See, e.g.*, An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W & M., Sess. 1, ch. XV, § 3 (1688), *in* 6 THE STATUTES OF THE REALM 71–72 (London, Dawsons of Pall Mall 1963); 1756 Virginia Act.

[57] 1723 Virginia Act §§ XIV, XV.

dangerousness. Further, neither the 1759 Pennsylvania law disarming Catholics nor the 1852 Mississippi law disarming Black people provided for exceptions.[58] Likewise, none of the "tramp" laws discussed above, *see supra* pp. 45–47, permitted non-dangerous "tramps" to possess firearms.

Second, a convicted felon can be exempted from Section 922(g)(1). Persons convicted of a nonviolent felony, or *any* felony for that matter, may regain their right to possess firearms if their conviction has been "expunged," if they have been "pardoned," or if they have "had [their] civil rights restored." 18 U.S.C. § 921(a)(20). Those exemptions may not necessarily turn on a particularized finding of dangerousness, or a lack thereof, but their existence is relevant when the Second Amendment test under which we assess the constitutionality of gun regulations requires only "relevant[] similar[ity]" between historical analogues and current regulations, not that they be "dead ringer[s]." *Rahimi*, 602 U.S. at 692 (internal quotation marks omitted).

Most importantly, Zherka's as-applied argument fails on a foundational level because the Supreme Court cautioned that the search for historical analogues is not a quest for a "historical twin." *Id.* (internal quotation marks omitted).

---

[58] *See* 1759 Pennsylvania Act; 1852 Laws of Miss., ch. 206, § 1.

Instead, a "well-established and representative historical analogue" is sufficient. *Bruen*, 597 U.S. at 30 (emphasis omitted). Contrary to Zherka's argument and the Sixth Circuit's dicta, even the historical disarmament statutes that permitted members of the disfavored group to possess firearms under narrow circumstances not always including a generalized showing of non-dangerousness are relevantly similar to Section 922(g)(1). "[H]ow and why the [historical] regulations burden[ed] a [person's] right to armed self-defense" are sufficiently similar to "how and why" Section 922(g)(1) burdens an individual's Second Amendment right. *Bruen*, 597 U.S. at 29. Those statutes, like Section 922(g)(1), disarmed whole classes of individuals based on a status that the legislature perceived as dangerous.

At times the legislature has crafted exceptions, at others, it has not. As Zherka points out, under Section 925(c), a felon previously could regain his right to bear arms, despite Section 922(g)(1), if he could establish, upon application to the Attorney General, that he was not dangerous to public safety. Every year since 1992, however, Congress has declined to fund the program implementing this provision.[59] As the historical record discussed above demonstrates, the courts have

---

[59] *See* Withdrawing the Attorney General's Delegation of Authority, 90 Fed. Reg. 13080, 13082 (Mar. 20, 2025) (to be codified at 27 CFR pt. 478); *see also*, *e.g.*, Treasury, Postal Service, and General Government Appropriations Act of 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732; Treasury, Postal Service and General Government Appropriations Act,

left the decision to establish an exemption structure, and the decision not to fund

one, to the sound discretion of the legislative branch.[60] There is no historical basis

_____

1994, Pub. L. No. 102-123, 107 Stat. 1226, 1228; Treasury, Postal Service and General Government Appropriations Act, 1995, Pub. L. No. 103-329, 108 Stat. 2382, 2385; Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub. L. No. 104-52, 109 Stat. 468, 471; Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009–319; Treasury and General Government Appropriations Act, 1998, Pub. L. No. 105-61, 111 Stat. 1272, 1277; Omnibus Consolidated Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-85; Treasury and General Government Appropriations Act, 2000, Pub. L. No. 106-58, 113 Stat. 430, 434; Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-129; Treasury and General Government Appropriations Act, 2002, Pub. L. No. 107-67, 115 Stat. 514, 519; Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 433; Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 53; Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 2859; Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-108, 119 Stat. 2290, 2295; Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 1903; Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 575; Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3128; Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 609; Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, 127 Stat. 198, 248; Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, 57; Consolidated Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2187; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2302; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 198; Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 415; Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 107; Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2401; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1251; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 118; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4527; Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 139.

[60] Section 925(c) may not remain defunct for long. Previously, the Attorney General had delegated the authority to adjudicate requests for a restoration of rights to the ATF. *See* Withdrawing the Attorney General's Delegation of Authority, 90 Fed. Reg. 13080 (proposed Mar. 20, 2025) (to be codified at 27 CFR pt. 478). To "give full effect to 18 U.S.C.

upon which we could declare Section 922(g)(1) unconstitutional because it sweeps too broadly. Zherka's as-applied challenge, therefore, fails.

* * *

Because legislatures at or near the Founding had the authority to pass laws disarming large classes of people based on status alone, we conclude that the Second Amendment does not bar Congress from passing laws that disarm convicted felons, regardless of whether the crime of conviction is nonviolent.

We acknowledge and are sympathetic to the fact that felon-in-possession laws have contributed to the mass incarceration crisis and its associated racial inequalities.[61] It may well be that there are sound policy reasons for restoring Section 925(c), or some similar regime, to effective operation. But that judgment is for Congress. The test that *Bruen* requires us to apply uses history as its guide, not policy concerns. Our task here is solely to follow the history.[62]

_____

§ 925(c)," the Attorney General recently proposed withdrawing from the ATF that delegation of authority to implement Section 925(c). *Id.* at 13083. We of course express no views on the compatibility of any hypothetical effort to reinstate Section 925(c) through rulemaking with Congress's repeated defunding.

[61] *See* Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. PA. L. REV. 637 (2021).

[62] We therefore do not attempt to assess whether, applying one traditional test for assessing whether legislation is consistent with individualized constitutional rights, the prohibition on possession of firearms by persons convicted of "nonviolent" felonies are narrowly tailored to accomplish a compelling governmental purpose. *Bruen* explicitly

Because history reveals a tradition of categorical legislative bans on firearms possession by classes of people perceived as dangerous, a prohibition directed at persons convicted of serious crimes is among the easiest classifications to justify. First, it is consistent with the Supreme Court's assurance in *Heller* that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 n.26. It is also consistent with our binding precedent in *Bogle*, in which we upheld the constitutionality of Section 922(g)(1) against a facial Second Amendment challenge based on that assurance. *Bogle*, 717 F.3d at 281–82.

Such a prohibition also aligns with the Supreme Court's insistence that "shall-issue" licensing regimes are constitutional because they are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted). "Shall-issue" licensing regimes "contain only narrow, objective, and definite standards guiding licensing officials," and often require "applicants to undergo a background check." *Id.* (internal quotation marks omitted). That it is permissible for a state to decline an applicant a firearms license based on information discovered in a background check,

_____

prohibits us from engaging in such a "means-end" analysis. 597 U.S. at 18–24.

57

which will often disclose prior criminal convictions, suggests that it is also permissible for the federal government to prohibit felons from possessing firearms.

Second, unlike the historical prohibitions of the eighteenth and nineteenth centuries, the ban on possession by convicted felons is based on the prohibited person's actual behavior, as admitted in a formal plea of guilt, entered with the guaranteed right to the advice of a lawyer or found by a unanimous jury beyond a reasonable doubt after a trial with vigorous procedural safeguards. Perhaps someday these prohibitions too will be looked back on with dismay. But unlike bans directed at minority racial, political, or religious groups, or at victims of economic misfortune, solely because of their group characteristics, the felon ban is based on actual past behavior.

That behavior, moreover, consists in the violation of basic terms of the social contract. That is true of all felony crimes, not just violent crimes. Zherka, for example, pleaded guilty to criminal conspiracy to make a false statement to a bank and to sign and file a false federal-income tax return, resulting in $8.5 million in fines, restitution, and forfeiture. That conduct is reasonably regarded as an indication that such a person lacks the "character of temperament necessary to be entrusted with a weapon." *Bruen*, 597 U.S. at 13 n.1 (internal quotation marks

removed).

Finally, any effort by the courts to craft a line that would separate some felons from others is fraught with peril. The idea that every felon, regardless of the crime of conviction, is entitled to some form of hearing as to whether that particular individual should be subject to a lifetime ban on firearms possession is inconsistent with the historical tradition permitting class-based legislative judgments.

Zherka also suggests that we should unilaterally narrow the category of offenses that Congress has subjected to the prohibition, arguing that "nonviolent" felons should be exempted from the category defined by Congress. Such a judicial exemption would usurp the legislative function. It would also embark on a line-drawing process that would raise endless questions with which the courts have had difficulty in other contexts.

Were we to decide that nonviolent felons are exempt from Section 922(g)(1), we would have to decide what would qualify a felon as violent or nonviolent. Would the sentencing court for a count adjudicating a later prosecution under Section 922(g)(1) look only at the underlying felony conviction, or would it consider other, unadjudicated facts about the individual's background? If the court were to consider the individual's background, which evidentiary standards would apply to

59

prove those background facts and which background facts are relevant? If only the underlying felony conviction mattered, would the court look only at the elements of the crime to determine whether it qualifies as violent, or would it look at the facts of the underlying offense?

To distinguish between violent and nonviolent crimes in the Second Amendment context, courts could employ the categorical approach, which is used to determine whether an offense is a crime of violence in the context of the Armed Career Criminal Act, and draw lines based on the elements of the crime of conviction. *See United States v. Evans*, 924 F.3d 21, 25 (2d Cir. 2019). That approach has, however, proven largely "unworkable." *Matthis v. United States*, 579 U.S. 500, 521 (2016) (Kennedy, J., concurring); *see also* Transcript of Oral Argument at 26, *United States v. Stitt*, 586 U.S. 27 (2018) (Alito, J.) (describing categorical approach jurisprudence as "one royal mess"). The categorical approach requires courts to resolve cases by "embark[ing] on an intellectual enterprise grounded in the facts of *other* cases not before them, or even *imagined* scenarios." *Evans*, 924 F.3d at 31 (emphasis in original). Whatever the merits of that approach in the context of a statute that has been deemed to require it, it is difficult to see how such a rule could be rooted in the text of the Second Amendment. It is also difficult to imagine,

moreover, why the courts should embark on an enterprise that has consumed years of judicial effort, culminating in a solemn argument in the Supreme Court about whether murder under New York's fairly typical definition was or was not categorically a "crime of violence." (It is, but the decision divided the Court.). *See Delligatti v. United States*, 145 S. Ct. 797 (2025)**.** That does not seem a promising way to proceed.[63]

On the other hand, were we to instead determine whether a felon qualifies as nonviolent by assessing that person's background, including the facts of particular offenses, we would have to face head-on the "practical difficulties and potential unfairness" that such a factual approach would present and which the categorical approach was developed to avoid. *See Taylor v. United States*, 495 U.S. 575, 601 (1990).[64]

_____

[63] Courts applying such an approach would also have to consider whether convictions for large-scale distribution of narcotics, an enterprise that is fraught with gun violence, but is not a categorically violent offense, should disqualify defendants from gun possession. In the context of sentence enhancements, Congress and the Sentencing Commission have chosen to lump such crimes together with categorically violent crimes. Such line-drawing is appropriate for legislatures but is impossible to root in the text of the Second Amendment or in historical practice. Nor is it a promising avenue for case by case as-applied determinations.

[64] This case would raise those various "practical difficulties." *See Taylor*, 495 U.S. at 601. The government contends that although Zherka was convicted of a nonviolent felony, he would be unlikely to qualify for relief under a hypothetical rights restoration program implemented pursuant to Section 925(c) because he has committed violent acts in the past.

Finally, we note that Congress has considered and rejected, after what it clearly regarded as a failed experiment, an approach that would have set up an administrative system of case-by-case, "as-applied" exceptions. In conjunction with the 1968 Gun Control Act, Congress authorized the restoration of a convicted felon's Second Amendment rights, upon the felon's application, as long as that person was not convicted of a crime involving the use of a firearm or other weapon. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 233. After several years, Congress, finding the project unsuccessful,[65] effectively repealed this effort by defunding the administrative apparatus charged with applying it. That was not a one-time decision – Congress has repeated the defunding as a budgetary decision annually from 1992 to the present.[66] There is no reason to think that the judiciary could do a better job.

For all these reasons, we join the majority of our sister circuits that have

_____

We do not rely on that assertion to resolve this appeal, but we offer it as an example of the type of fact that could be considered when determining whether a felon is nonviolent and to demonstrate the difficult line-drawing that such a system of adjudication would require.

[65] *See* S. Rep. No. 102-353, at 19 (1992) (noting that reviewing applications was a "very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made").

[66] *See supra* note 59; *see also supra* note 60 (explaining the Attorney General's proposed rulemaking related to Section 925(c)).

62

considered similar arguments, and we reject Zherka's contention that the prohibition on possession of firearms by convicted felons violates the Second Amendment as applied to "nonviolent" felons.

## VI. Appellant Does Not Have a Procedural Right to More Process to Determine Whether He is Too Dangerous to Possess a Firearm.

What has been said above effectively disposes of Zherka's alternative contention that he has a due process right to a mechanism for relief from Section 922(g)(1). Because Section 922(g)(1) constitutionally disarms felons as a class, without need to find individual present dangerousness, there is no set of facts that Zherka could establish that would result in the restoration of his right to bear arms. He is therefore not entitled to the process that he seeks. *See Conn. Dep't Pub. Safety*, 538 U.S. at 7 ("[E]ven assuming, arguendo, that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the [challenged] statute.").

### CONCLUSION

For the reasons stated above, we affirm the judgement of the district court dismissing Zherka's complaint.